1

*AUDILETT LAW PC*
335 NORTH WILMOT RD SUITE 500
TUCSON, ARIZONA 85711-2636
(520) 748-2440
Email: daa@audilettlaw.com

2

3

Daryl A. Audilett, Esq.
State Bar No. 009007; PCC No. 2036
Attorney for Defendants

4

5

6

IN THE UNITED STATES DISTRICT COURT

7

FOR THE DISTRICT OF ARIZONA

8

| Lucha Unida de Padres y Estudiantes (LUPE), Zaira Livier Serrato, Edward Cott, Steffany Cott, Brittany Fitzgerald, David Archuleta, Rolande Baker, Heidi Reynolds-Stenson, Lena Rothman, Fritzi Redgrave, Josh Dunlap, Joan Cichon, Alexander Wyckoff and Fiona Grugan, | NO.  CV 18-00085-TUC-RM |
| --- | --- |
| | DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| Plaintiffs, | |
| v. | (Oral Argument Requested) |
| Tucson Police Officers Green #51068, Sgt Baca #51780, Wakefield #42231, Moreno #51098, Guevara #49552, Ewings #53652, Dragon #49549, Gannon #49562, Sgt. Salisbury #51925, Luna #35488, Parris #34961, Rodriguez #54038, Nickels#100043, Merlin #101284, Hatch #51940, in their individual capacities, | (The Honorable Rosemary Marquez) |
| Defendants. | |

9

10

11

12

13

14

15

16

17

18

19

        Pursuant to Rule 56, Federal Rules of Civil Procedure, all Defendants move for

20

21

summary judgment on all Counts of Plaintiffs' Complaint.

22

## **SUMMARY JUDGMENT PRINCIPLES**

23

        On a motion for summary judgment, the Court views the evidence and all reasonable

24

25

inferences in the light most favorable to the party opposing the motion.  *See*, *Anderson v.*

26

*Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Summary judgment is appropriate if the

*LUPE, et al., v. Green, et al.*
US District Court No. CV 18-00085-TUC-RM

pleadings and supporting documents demonstrate no genuine issue of any material fact and that the moving party is entitled to judgment as a matter of law. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). If a moving party shows an absence of evidence supporting the claim against it, the non-moving party may not rest upon the mere allegations or denials of its pleadings, but must set forth specific facts showing that there is a genuine issue for trial. <u>Anderson</u>, 477 U.S. at 256.

## **FACTS**

This lawsuit involves a protest rally held on February 16, 2017. (Complaint Doc 1, ¶ 36.) The protest was held by Lucha Unida de Padres y Estudiantes (LUPE). The protest began at 4:30 pm in front of the Federal Building in Tucson. (Id., ¶ 39.) At approximately 5:50 pm the protesters marched across Congress St. (Congress) at Granada and then marched eastbound on Congress. (Id., ¶ 42.) At that time Tucson Police Department (TPD) officers intervened to move the protesters from blocking traffic EB on Congress, onto the sidewalk on the south side of Congress.

LUPE is a political and community organization in Tucson. (Complaint, ¶ 4.) LUPE has no structure; it is just a collective of people. (SSOF 308.) Plaintiff Zaira Livier Serrato (Livier) was part of the organizing team for the protest event. (SSOF 304.) According to Plaintiff Livier, neither Tucson city government nor the Tucson Police Department was notified that the protest event was going to occur. (SSOF 309.) "We don't tell the police that it's happening." (SSOF 310.)

Tucson Police Department Sgt. Baca was the sergeant for the downtown area. TPD

2

*LUPE, et al., v. Green, et al.*
US District Court No. CV 18-00085-TUC-RM

would try to make contact with an organizer and monitor the event. If the crowd decided to march, the police would then follow the crowd or make arrangements for the crowd to march down the street.  (SSOF 25.)  Sgt. Baca did not get notice of the event until about 4:44 pm so there was no operational plan for the protest.  (SSOF 27, 28.)  TPD makes efforts to facilitate First Amendment speech.  (SSOF 33.)  Most times, TPD gets advance notice or contact with the organizer and the organizer will say we might march, and they get into the street, and TPD officers provide safety for everyone involved.  (SSOF 35.)  That prior notice occurred with other protest events, i.e., the Women's March and the protest on Inauguration Day. (SSOF 32, 34.)

The decision to march was made at the rally; it was spontaneous and not made before the event.  (SSOF 257.)  Estimates of the number of participants at the event range from 60, to 65-70, to 100 plus.  (SSOF 40, 103, 276.) There were only three TPD officers monitoring the event, Officer Hatch, Officer Moreno, and Officer Green.  (SSOF 4.)  Officer Hatch heard one of the protesters advise over a loudspeaker that they were going to march. (SSOF 5.)  The crowd began to walk WB using the sidewalk.  The crowd crossed Congress at Granada and then began to walk EB in the street on Congress, blocking all lanes of EB travel.  This was unexpected.  This was during rush hour.  (SSOF 7.)

Officers Green, Moreno, and Hatch immediately tried to get the protesters out of Congress Street and onto the sidewalk.  Officer Green moved his marked TPD Tahoe SUV into the roadway ahead of the marching protesters.  (SSOF 8.)  Officer Green waved his hand out the car window to tell them to get back on the sidewalk.  (SSOF 64.)  Officer

3

*LUPE, et al., v. Green, et al.*
US District Court No. CV 18-00085-TUC-RM

Green was telling them to get back on the sidewalk.  (SSOF 65.)  Officer Moreno used his bicycle and body to direct the protesters back onto the sidewalk.  (SSOF 9.)  Officer Moreno positioned himself and his bicycle between the center median and Officer Green's patrol vehicle.  (SSOF 107.)  Officer Hatch got on his patrol car loudspeaker giving the command several times, "Ladies and Gentlemen, for your safety and for the safety of the motorists behind you, please use the sidewalks."  (SSOF 9.)  Officer Moreno heard Officer Hatch giving commands via loudspeaker for the protesters to move to the sidewalk.  (SSOF 106.)

A protester named David Leon (Leon) approached Officer Moreno, and Officer Moreno told Leon to move to the sidewalk, and Moreno put his arm out in front of Leon to keep Leon from proceeding EB on the roadway.  (SSOF 108.)  Leon stated, "Don't touch me" and stepped forward and Officer Moreno was hit in the back with Leon's right arm.  Officer Moreno took hold of Leon's arm and told Leon to put his hands behind his back.  Leon refused and attempted to pull away.  (SSOF 108.)

At this time a crowd started forming around Officer Moreno and Leon.  Officer Green got out of his patrol Tahoe SUV to assist Moreno in detaining Leon.  Leon continued to resist.  Officers Green and Moreno eventually handcuffed Leon and put Leon into the backseat of Officer Green's patrol Tahoe SUV. Officer Moreno moved to the front of the SUV with his bicycle and attempted to hold the crowd back from surrounding the patrol vehicle.  (SSOF 109.)  Officer Green got on his radio and announced a 10-84/10-18, officer needs assistance-emergency response, and it was later called over the radio as an officer

*LUPE, et al., v. Green, et al.*
US District Court No. CV 18-00085-TUC-RM

urgently needs assistance, a 10-99, a City-wide call for assistance.  (SSOF 117, 163, 174, 222.)

When the officers had Leon up against the vehicle door, there were crowds saying "Let him go, let him go."  (SSOF 277, 278.)  After the officers put Leon in the patrol vehicle, protesters then positioned themselves in front of the patrol vehicle and linked arms to block it from taking Leon to jail.  (SSOF 237, 239, 261.)  Plaintiff Fritzi Redgrave joined that crowd.  (SSOF 278.)  Officers had to forcibly pull the protesters' arms apart.  (SSOF 238.)  Protesters were on the driver's side of the police vehicle, demanding that Leon be released.  They were chanting "Let him go, let him go."  (SSOF 259.)  Plaintiff Fritzi Redgrave was initially for a short time in the group at the front bumper linking their arms, but she left because people were shoving and it was just too rowdy for her.  (SSOF 280.)  There were approximately 10 people in front of the patrol car with their arms linked.  (SSOF 280.)

Protesters and police officers alike have described the scene as chaos, chaotic, rowdy, violent.  Plaintiff Joan Cichon said that after Leon was arrested there was chaos.  (SSOF 249.)  Plaintiff Fiona Grugan said it was chaotic, it was chaos in the street.  (SSOF 272, 274.)  Plaintiff Fritzi Redgrave said there was a lot of commotion and it was pretty chaotic.  (SSOF 279.)  Plaintiff Heidi Reynolds-Stenson said it was pretty chaotic.  (SSOF 299.)  Plaintiff Zaira Livier said that it was a little chaotic for a little bit.  (SSOF 311.)  Plaintiff Alexander Wycoff said there was a lot of confusion and a little bit of chaos.  (SSOF 317.)  Sgt. Baca said that when he got to the scene, it was fairly chaotic.  (SSOF 39.)

Officer Guevara said that he doesn't normally use pepper spray and prefers to go hands-on, but in this case, it was just way too chaotic to do that.  (SSOF 98.)  Officer Guevara did in fact use his pepper spray.  When Officer Guevara arrived, there were a lot of people in the street. (SSOF 79.)  There 50 or 60 people, possibly more, and they were around the Tahoe.  There were people in the street from one side to the other.  (SSOF 80.)  Officer Guevara pulled out his pepper spray a relatively short time after getting there, or at least had it in his hand.  He had it out for a while before he used it.  (SSOF 83.)  Officer Guevara is a field training officer and a grenadier.  They can use pepper spray when the subject is aggressive. (SSOF 84.)  They can use pepper spray to gain compliance if a subject is noncompliant. (SSOF 84.)

Officer Guevara used pepper spray twice.  One was on a woman who had a cell phone in one hand and a megaphone in the other, four or five feet away from him.  She was moving toward him when he sprayed her.  (SSOF 85, 86.)  She was about 5'8" tall and about 200 lbs, with brown hair and wearing a red shirt and blue jeans.  (SSOF 89.) She went down to the ground on her own.   (SSOF 92.)   It is undersigned counsel's understanding that this woman is not a plaintiff in this lawsuit.

The second person that Officer Guevara sprayed was a man about five or six feet away.  It looked like that man was coming toward him, but looking at the video footage, Guevara thinks that the man may have been trying to go down to help someone close to them.  (SSOF 90.)

Officer Green also ultimately used his pepper spray, but we need to review his

*LUPE, et al., v. Green, et al.*
US District Court No. CV 18-00085-TUC-RM

conduct from the beginning.  Officer Green has covered protests downtown in the past when people were allowed to march in the street and TPD provided traffic control to help escort them safely. (SSOF 56.)  In those instances, TPD has a lot more officers there. (SSOF 56.)

As we noted above, there were initially only three officers present for this LUPE event.  As we also noted above, LUPE did not give prior notice that there would be a march in the street.  Plaintiff Cott testified that the decision to march in the street was not made before the event started and was a "spontaneous" decision made after the speakers were done speaking.

Officer Green's job was to just monitor the group.  We noted above that Officer Green was accompanied by Officers Moreno and Guevara.  Initially Officer Green was on the south side of the roadway (Congress), watching the group who were across the road right in front of the federal building.  (SSOF 59.)  Office Green saw the group of about 75 people start to move.  (SSOF 61.)  The group went WB on the sidewalk, crossed Congress at Granada, then into the vehicle travel portions of EB Congress, blocking EB traffic on Congress.  (SSOF 62.)  Several vehicles behind the group could not get through.  (SSOF 63.)

Officer Green pulled his vehicle into the line of traffic and a large group of protesters walked toward his vehicle as he was pulling out and waving his hand out the window to tell them to get back on the sidewalk.  (SSOF 64.)  He was telling them to get back on the sidewalk.  (SSOF 65.)  He was trying to get them safely to the sidewalk. (SSOF 66.)  A

*LUPE, et al., v. Green, et al.*
US District Court No. CV 18-00085-TUC-RM

few people went behind Officer Green's vehicle and a few more went in front.  Officer Green got out of his vehicle to help Officer Moreno arrest someone .  (SSOF 70.)  That turned out to be David Leon.  Officer Green put Leon in the backseat, and got into the driver's seat, but could not leave because a group of people stood in front of his vehicle.

There was a lady named Joan Cichon standing at his driver's door yelling at him.  Officer Green yelled at her to move and began opening his door into Cichon.  When it was open far enough for him to get his left leg out, Cichon used her body and slammed the car door back on his leg.  Officer Green then opened his car door, got out, and arrested Cichon for assault.

After handcuffing Cichon and placing her in the back of Officer Kidd's car, Officer Green returned to his car.  Officer Green assisted other officers in pulling the people from the front bumper area of his vehicle.  Then another officer drove Officer Green's patrol car away from the crowd.  People began surrounding the officers and moving toward the officers.  An older female fell to the ground in front of Officer Green and people began to push towards her and the officers.  Officer Green sprayed an older woman with long grey hair.  (SSOF 72.)  That person was later identified as Plaintiff Rolande Baker.  She had been told multiple times, numerous times (to get back).  When she came forward and Ms. Redgrave was on the ground, Officer Green wanted to make sure that Ms. Redgrave did not get trampled.  They had already told everybody they needed to get back.  (SSOF 73.)

## COUNT ONE FAILS TO STATE A CLAIM

Count One (Complaint paragraphs 219-220) claims damages under 42 USC §1983

*LUPE, et al., v. Green, et al.*
US District Court No. CV 18-00085-TUC-RM

for all Plaintiffs against all Defendants.  Section 1983 allows citizens to bring legal action against state actors who, under color of law, deprive a citizen "any rights, privileges, or immunities secured by the Constitution and laws…".  42 USC 1983. Count One contains no federal statute or federal constitutional provision that was violated.  Section 1983 "is not itself a source of substantive rights", but merely provides "a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393-4, 109 S.Ct. 1865, 1870 (1989).

Count One fails to state a claim and should be dismissed.

## COUNT TWO (AGAINST DEFENDANTS FOR FIRST AMENDMENT VIOLATIONS)

The First Amendment to the U.S. Constitution secures the right to free speech and to peaceably assemble, a violation of which by state actors can give rise to a claim for damages under 42 USC 1983.

In this lawsuit there is no evidence that any of the Defendants interfered with any of the speech of any of the Plaintiffs.  In fact, as the videos of the protest clearly demonstrate, protesters were freely speaking, chanting, yelling, and using bullhorns.  No one was forced to stop or to curtail their speech by any of the Defendant TPD officers.

Nowhere in the Complaint is there a claim that the verbal speech of any of the Plaintiffs was silenced or curtailed.  Nowhere in the Complaint is there a claim that any of the protesters' signs or banners taken away from them.  Complaint paragraphs 58 through 218 contain the "**FACTUAL ALLEGATIONS RELEVANT TO SPECIFIC**

*LUPE, et al., v. Green, et al.*
US District Court No. CV 18-00085-TUC-RM

**PLAINTIFFS**."  There are no allegations that the speech of any of the 14 Plaintiffs was silenced or curtailed by any of the 15 TPD officers.  There is no evidence that any of the officers stopped or sought to stop the Plaintiffs from speaking, chanting, yelling, or using a bullhorn to express their speech.  There is no evidence that any of the protesters were ordered by the officers to stop speaking, or even to quiet down.  As demonstrated by the videos of the event, even after the protesters were moved from the vehicle travel portions of Congress Street and onto the south sidewalk, they continued to express themselves vocally without interference by the officers.

The First Amendment also affords protections to citizens engaged in the right to "peaceably assemble."  The protesters occupied EB Congress Street during the evening rush hour, blocking traffic.  This created a traffic problem, and a public safety problem, exposing the protesters to danger from being injured by moving vehicles.  The safest and most efficient way to resolve the traffic and public safety problems was to move the protesters from the street onto the sidewalk.  Once out of the street and on the sidewalk the protesters were free to continue their demonstration and protest, and they did.

The First Amendment does not protect unruly or unlawful assembly.  The video footage of the protest depicts an unruly assembly.  It was not peaceful.  The TPD officers did not violate anyone's First Amendment right to peaceful assembly by quelling the unruly assembly and getting the protesters out of the street and onto the sidewalk to engage in their protest demonstration.  The TPD officers took legitimate action to restore public safety, safety of the protesters, and safe travel for eastbound motor vehicle traffic.

*LUPE, et al., v. Green, et al.*
US District Court No. CV 18-00085-TUC-RM

Presumably, Count Two is directed at the 15 Defendant TPD police officers that quelled the unruly assembly by getting the protesters from the vehicle travel lanes of Congress to the sidewalk for their own safety, for public safety, and to reestablish vehicle traffic flow on Congress during rush hour.  There are separate statements of fact from each officer.  These are set forth below in the order that the defendant appears in the caption of the Complaint.

1.      Officer Green.  See SSOF 55-75 and 339-387.  These statements of fact demonstrate Officer Green's efforts to remove the people from Congress onto the sidewalk.

2.      Sgt. Baca.  See SSOF 25-54.  These statements of fact demonstrate Sgt. Baca's reasonable efforts to get people out of the street on Congress and onto the adjoining sidewalk.

3.      Officer Wakefield.  See SSOF 181-191.  Officer Wakefield did not have physical contact with any of the protesters.

4.      Officer Moreno.  See SSOF 100-113.      Officer Moreno was the bicycle officer that was struck by protester David Leon and arrested David Leon.  These statements of fact demonstrate Officer Moreno's reasonable efforts to remove the people from Congress onto the sidewalk.

5.      Officer Guevara.  See SSOF 76-99.  Officer Guevara did use his pepper spray in his efforts to control the crowd and get the crowd out of the street and onto the adjoining sidewalk.

6.      Officer Ewings.  See SSOF 161-170.  Officer Ewings assisted other officers

*LUPE, et al., v. Green, et al.*
US District Court No. CV 18-00085-TUC-RM

in moving the crowd from the street to the sidewalk.  She physically removed some of the protesters from the marked patrol Tahoe.  She did not use her pepper spray.

7.      Officer Dragon.  See SSOF 130-145.  Officer Dragon assisted in dealing with arrestee David Leon (not a plaintiff).  He assisted in trying to remove protesters holding onto the front of the Tahoe.  Officer Dragon dealt with protester Tanya Blancarte (not a plaintiff) who was ultimately handcuffed and removed from the street.

8.      Officer Gannon.  See SSOF 114-129.  Officer Gannon did not use pepper spray.  Officer Gannon did push people to get them back to the sidewalk for their safety, but he did not push anyone to the ground.

9.      Sgt. Salisbury.  See SSOF 192-200.  Sgt. Salisbury was assigned to supervise the arrest and officer rescue team.  Sgt. Salisbury had no direct contact with any members of the public, and he did not use pepper spray.

10.      Officer Luna.  See SSOF 214-219.  Officer Luna arrived on scene at the end of the event, when most of the protesters had moved to the sidewalk on the south side of Congress.  He joined a "skirmish line" on the south side of Congress to keep the protesters on the sidewalk and out of the street for their own safety and so that EB traffic could resume safely.

11.      Officer Parris.  See SSOF 201-213. Officer Parris assisted in removing the protesters away from the Tahoe and out of the street.  He did not use pepper spray.  Officer Parris physically directed people to the sidewalk, but he did not push anyone.

12.      Officer Rodriguez.   See SSOF 146-160.   Officer Rodriguez assisted in

*LUPE, et al., v. Green, et al.*
US District Court No. CV 18-00085-TUC-RM

removing people from the front bumper area of the Tahoe.  One male he dealt with fell to the ground.  One female, Najima Rainey (not a plaintiff) fell to the street and began passively resisting removal from the street.  She was ultimately removed from the street, detained, handcuffed, and arrested for obstructing the roadway.

13.      Officer Nickels.  See SSOF 220-232.  Officer Nickels assisted with the detention and arrest of Tanya Alvarez-Blancarte (not a plaintiff).  He transported her to the downtown station prisoner processing area.  Officer Nickels assisted in getting her husband to bring her medication for high blood pressure.

14.      Officer Merlin.  See SSOF 171-180.  Officer Merlin arrived after the crowd had been relocated to the sidewalk.  He took a position on a security line facing the south side of Congress to keep the crowd on the sidewalk.  Officer Merlin did not push anyone or go hands-on with anyone.  Neither did he use his pepper spray.

15.      Officer Hatch.  See SSOF 1-24.  Officer Hatch tried to control the crowd in the street and get them to the sidewalk, and radioed for assistance.  He witnessed Plaintiff Joan Cichon push the Tahoe driver's side door against Officer Green's leg.  Officer Hatch was involved in dealing with arrestee David Leon (not a plaintiff).

Count Two alleging violations of First Amendment free speech and peaceful assembly should be dismissed.  Reasonable attempts were made to quell the unruly, unlawful and unsafe gathering in the middle of Congress by the individually named TPD Officers Green, Baca, Wakefield, Moreno, Guevara, Ewings, Dragon, Gannon, Salisbury, Luna, Parris, Rodriguez, Nickels, Merlin, and Hatch.  Their goal to safely move the crowd

*LUPE, et al., v. Green, et al.*
US District Court No. CV 18-00085-TUC-RM

from the street was accomplished.  All defendant officers should be dismissed from Count Two.

### COUNT THREE (42 USC §1983 FOR 4TH AMENDMENT VIOLATIONS OF EXCESSIVE FORCE BY DEFENDANTS GREEN AND GUEVARA)

*Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865 (1989) established the "objective reasonableness" standard by which claims of Fourth Amendment violations by police use of force are evaluated. 490 U.S. at 388, 109 S.Ct. at 1867.  The Supreme Court held that "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. (Citation omitted.) *Id.*, 490 U.S. at 396. *** "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," (citation omitted) violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.*, 490 U.S. at 396-397.

The descriptions by both the officers and the protesters, and the video footage showing the chaotic nature of the event should be taken into consideration.  The defendants request that the Court review the exhibit videos (SSOF 338) submitted in order to analyze Plaintiff's claims in the "totality of the circumstances" as held in *Graham*, citing *Tennessee v. Garner*, 471 U.S. 1, at 8-9, where "the question is 'whether the **totality of the circumstances** justifie[s] a particular sort of … seizure'.  *Graham v. Connor*, 490 U.S. at

14

*LUPE, et al., v. Green, et al.*
US District Court No. CV 18-00085-TUC-RM

396.  (Emphasis added.)

The Supreme Court in *Graham* held that proper application of the objectively reasonable standard "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. See *Tennessee v. Garner*, 471 U.S., at 8–9, 105 S.Ct., at 1699–1700 (the question is "whether the totality of the circumstances justifie[s] a particular sort of ... seizure")."  In the case at bar, the protesters in the street were violating a number of statutes including:

1.  ARS 13-2906 - Obstructing a highway or other public thoroughfare;

2.  ARS 13-2904 -  Disorderly conduct;

3.  ARS 13-2902 – Unlawful assembly; and

4.  ARS 13-2903 – Riot.

The conduct of the protesters, including the Plaintiffs, posed a threat to public safety, including the safety of the protesters, the officers, motorists and others.

Police have no duty to retreat regarding Fourth Amendment use of force situations. *Reed v. Hoy*, 909 F.2d 324, 331 (9th Cir. 1989); See also, *Reed v. Hoy,* 891 F.2d 1421, 1428 (9th Cir. 1989).

Plaintiff Fritzi Redgrave claims that Officer Green used excessive force by pushing her to the ground.  Redgrave (red ball cap, light colored shawl) appears on video beginning at 4:10 minutes in Officer Parris's body worn camera video.  (SSOF 338, Exhibit 29C).

15

The video shows Redgrave again at 4:42, standing next to a lady (Blancarte in a brown shirt and brown beret, not a plaintiff) at the front bumper area of the patrol Tahoe.  At 4:48 Officer Green (white shirt) is shown pulling people away from the front bumper area of the Tahoe.  The buildings in the background are those on the south side of Congress near the sidewalk.  At 4:54 the video shows Redgrave with right arm outstretched, advancing.  When Redgrave gets close to Officer Green, he reaches out to push Redgrave's hand back and she falls to the ground.  Redgrave admits that she was not pepper sprayed and was not hurt in the fall.  (SSOF 286.)  Under a *Graham v. Connor* analysis, Officer Green's actions were objectively reasonable as a matter of law.  In his Declaration, Officer Green describes his interaction with Redgrave after reviewing the video.  (SSOF 384 – 386.)

Plaintiffs Reynolds-Stenson, Rothman, Baker, Cichon, Wykoff, Dunlap and Grugan make Fourth Amendment excessive force claims against TPD Officers Green and Guevara for using pepper spray on them.  (Complaint ¶ 224.)  Officers Green and Guevara used their pepper spray on individuals that approached while they were in the middle of a very tense, chaotic and unruly gathering of protesters in the EB vehicle travel portions of Congress Street in downtown Tucson.

During the melee, and while in the middle of Congress, Plaintiff Heidi Reynolds-Stenson (green ball cap) was in the street and Officer Green sprayed her to keep her back.  This event is captured at 4:00 through 5:20 on Exhibit 29C.  (SSOF 338, Exhibit 29C.)

Plaintiff Linda (aka Lena) Rothman was in the roadway on the other side of the patrol vehicle when she claims that she got sprayed. (SSOF 303.)

*LUPE, et al., v. Green, et al.*
US District Court No. CV 18-00085-TUC-RM

Plaintiff Rolande Baker was in the area of the front bumper of the police Tahoe and claims that she was pepper sprayed as she was trying to pick up Fritzi Redgrave from the ground.  (SSOF 236-241.)  This event is captured on video Exhibit 29C beginning at 5:05.  (SSOF 338.)  Officer Green stated he sprayed an older woman with long grey hair.  Ms. Baker was the older woman, and Green felt justified in spraying her at a close distance.  She had been told multiple times to get back.  Then when she came forward again and Ms. Redgrave was on the ground, Green wanted to make sure Redgrave didn't get trampled.  They had already told everyone they needed to get back.  (SSOF 72, 73.)

Plaintiff Joan Cichon claims she was sprayed but the video does not show that.  What the video shows is Cichon at the driver's side of the police Tahoe involved with Officer Green pushing his vehicle door open and Cichon pushing the door back against Officer Green.  Cichon was arrested and escorted away.  Video of this appears on Exhibit 29A at 7:15 through 7:35.  (SSOF 338.)

Plaintiff Alexander Wycoff was in Congress Street where the small older lady (presumably Fritzi Redgrave) fell and he tried to insert himself between her and the police and he got pepper sprayed. Wycoff admits that the lady was "on the ground in the midst of a fair amount of chaos, maybe not chaos, but in a situation that felt violent and I was pepper sprayed several times."  (SSOF 315-320.)

Plaintiff Josh Dunlap described the event as "group jaywalking."  (SSOF 265.)  Dunlap was in the vicinity of the front of the Tahoe and the police were saying to move out of the street, get back to the sidewalk.  He was at the far end of the bumper and the

police officers eventually pulled people off the front bumper.  Dunlap was pulled to the

ground.  Then he went to try to lift an elderly woman that had been knocked to the ground

nearby (presumably Fritzi Redgrave) and that is when he was pepper sprayed.  (SSOF 266-

268.)

Plaintiff Fiona Grugan describes the event as "chaos in the street".  (SSOF 274.)

Grugan says that she was pepper sprayed when she was on the sidewalk by a female police

officer who was "like sweeping across a group of people."  (SSOF 275.)  But Grugan did

not claim in the Complaint that a female officer pepper sprayed her.  Count Three of the

Complaint at paragraphs 224 and 225 alleges excessive force via pepper spray only against

Officer Green and Officer Guevara, both of whom are male officers.

Count Three also makes a claim that Officer Green hit Plaintiff Joan Cichon with

the door of the police Tahoe.  That event is depicted on video on Exhibit 29A at 7:15

through 7:35. (SSOF 338.)  Officer Green was trying to get out of his patrol car to help

move people away from the car.  Officer Green yelled at Cichon to move, but she didn't,

so he pushed the door against her to move her back. (SSOF 365.)  Green kept applying

pressure until he was able to get his left leg out of the car.  At that point Cichon used her

body and slammed the car door shut on Green's leg.  Green then pushed the door back

open and got out of the car.  (SSOF 366, 367.)  The video shows Officer Green exiting the

Tahoe and pushing his door against Cichon to move her back.  Then Officer Green gets

back into the Tahoe, but as he does that Cichon forcefully pushes the door against Officer

Green.  Officer Green arrests Cichon and hands her off to another officer.  Officer Green

*LUPE, et al., v. Green, et al.*
US District Court No. CV 18-00085-TUC-RM

next appears on video trying to pull people off the front of his police Tahoe. (SSOF 338, Exhibit 29A, at 8:40 minutes.)

In Count Four, in addition to the claim of Fourth Amendment excessive use of force by Officer Green and Officer Guevara, there is a state law claim of battery.  (Complaint, paragraphs 228-230.  The battery claim is simply a reiteration of the Fourth Amendment claim set forth in the state law claim of battery.  Hence, the same discussion set forth above addressing the Fourth Amendment claim applies to the state law battery claim.  A reasonable use of force by a police officer does not constitute a state law battery or assault.

Also contained in Count Four of the Complaint at paragraphs 231-237 is a claim by Plaintiff Joan Cichon against Officer Green of state law false arrest and false imprisonment. This claim arises from the Tahoe door event described above.  The video depicts Cichon forcefully pushing the Tahoe door back against Officer Green.  That is an assault against Officer Green under ARS 13-1203, and aggravated assault under ARS 13-1204(8)(a). There was probable cause as a matter of law to arrest Cichon for assaulting Officer Green.

## LUCHA UNIDA DE PADRES y ESTUDIANTES (LUPE) IS NOT A PROPER PARTY PLAINTIFF

Plaintiff LUPE is not a legal or jural entity subject to suing or being sued.  A search of the Arizona Corporation Commission does not reveal any corporate entity LUPE or Lucha Unida de Padres y Estudiantes, or United Struggle of Parents and Students.  LUPE member Zaira Livier described LUPE as made up of volunteers and just a collective of people.  There is no real structure to it.  There is no president, no board, no funding.  SSOF

*LUPE, et al., v. Green, et al.*
US District Court No. CV 18-00085-TUC-RM

234-235.

A jural entity is defined as an entity "[r]ecognized or sanctioned by positive law; embraced within, or covered by, the rules and enactments of positive law.  Founded in law, organized upon the basis of a fundamental law, and existing for the recognition and protection of rights." See, Black's Law Dictionary, 5th Edition, p. 764.

LUPE is not a jural entity subject to suit or filing suit and should be dismissed as a plaintiff in this lawsuit.

## THE DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY

Qualified immunity is a very robust defense in lawsuits against law enforcement officers.  Qualified immunity protects all but the "plainly incompetent" police officer or those who knowingly violate the law.  *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015). It cannot be concluded that any of the defendant TPD officers are "plainly incompetent" or knowingly violated the law during the chaotic event at issue.

In *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151 (9th Cir. 2001), the Court gave useful guidance in analyzing the applicability of qualified immunity.

"The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.

*LUPE, et al., v. Green, et al.*
US District Court No. CV 18-00085-TUC-RM

"*Graham* does not always give a clear answer as to whether a particular application of force will be deemed excessive by the courts. This is the nature of a test which must accommodate limitless factual circumstances. This reality serves to refute respondent's claimed distinction between excessive force and other Fourth Amendment contexts; in both spheres the law must be elaborated from case to case. Qualified immunity operates in this case, then, just as it does in others, to protect officers from the sometimes 'hazy border between excessive and acceptable force,' *Priester v. Riviera Beach*, 208 F.3d 919, 926–927 (C.A.11 2000), and to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful.

"*Graham* and *Anderson* refute the excessive force/probable cause distinction on which much of respondent's position seems to depend. The deference owed officers facing suits for alleged excessive force is not different in some qualitative respect from the probable-cause inquiry in Anderson. Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause or exigent circumstances, for example, and in those situations courts will not hold that they have violated the Constitution. Yet, even if a court were to hold that the officer violated the Fourth Amendment by conducting an unreasonable, warrantless search, Anderson still operates to grant officers immunity for reasonable mistakes as to the legality of their actions. The same analysis is applicable in excessive force cases, where in addition to the deference officers receive on the underlying constitutional claim, qualified immunity can apply in the event the mistaken belief was reasonable." *Saucier*, 533 U.S. at 205-206.

TPD was presented with a very chaotic, unruly gathering with protesters creating danger for everyone in a highly traveled thoroughfare in downtown Tucson during evening rush hour traffic. The protesters were aggressive and far outnumbered the police officers. Protesters and police alike described the situation as chaotic. Getting people out of the

*LUPE, et al., v. Green, et al.*
US District Court No. CV 18-00085-TUC-RM

street was a paramount concern.  The totality of the circumstances and attendant chaos should allow some deference to the officers who were making split second decisions in a chaotic environment.  The officers are entitled at the very least to qualified immunity.

**DEFENSE POLICE PROCEDURES EXPERT OPINES THAT THE CONDUCT OF THE OFFICERS WAS REASONABLE UNDER THE CIRCUMSTANCES**

Defense police procedures expert George Richards has reviewed the materials in this case and reviewed the video footage of the protest event. Regarding the First Amendment claims, George Richards opines that by taking over Congress the protesters created a dangerous situation for all involved, and that it was objectively reasonable for the officers to intervene.  Regarding the 4th Amendment use of force claims, Officer Green's interaction with and arrest of Plaintiff Joan Cichon was objectively reasonable.  Officer Green's interaction with Plaintiff Fritzi Redgrave and his use of force was objectively reasonable under the circumstances.   Finally, Expert Richards addresses claims of excessive force regarding the officers' use of pepper spray and concludes and opines that it was objectively reasonable under the circumstances.

**CONCLUSION**

The protesters created a very unsafe and traffic obstructing situation, effectively closing down all eastbound lanes of Congress during evening rush hour in downtown Tucson.  TPD sought to remedy that unsafe and traffic obstructing situation, and did so effectively and efficiently, even though TPD was presented with a chaotic scene and faced with trying to control a belligerent and aggressive crowd.  The TPD officers involved did

*LUPE, et al., v. Green, et al.*
US District Court No. CV 18-00085-TUC-RM

not violate the First Amendment rights of the protesters.  The TPD officers did not use excessive force or commit battery.  The TPD officers did not falsely arrest or falsely imprison Plaintiff Cichon or anyone else.  At the very least, the TPD officers are entitled to qualified immunity.

DATED this 25th day of October, 2019.

*AUDILETT LAW PC*


/s/ Daryl A. Audilett
_____
Daryl A. Audilett, Esq.
Attorney for Defendants


CERTIFICATE OF SERVICE

I hereby certify that on October 25, 2019, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Paul Gattone, Esq.
Ashley Gilpin, Esq.
Law Office of Paul Gattone
301 S. Convent
Tucson, AZ 85701
**Attorneys for Plaintiff**

By  /s/  Karen Audilett