IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF ARIZONA

Lucha Unida de Padres y )
Estudiantes, et al., )
    )
        Plaintiffs, )
    )
    vs. ) No. CV18-00085 TUC-RM
    )
Tucson Police Officers Green )
#51068, et al., )
    )
        Defendants. )
    )

DEPOSITION OF ALBERT BACA

Tucson, Arizona

September 16, 2019

RAYNBO COURT REPORTING, LTD.

3625 West Gailey Drive
Tucson, Arizona  85741
520/744-2293

Reported by:  Raynbo Silva, RPR, CR
              Certified Reporter No. 50014

**Page 2**

```
 1   DEPOSITION OF ALBERT BACA
 2   Tucson, Arizona
 3   September 16, 2019
 4
 5                INDEX
 6                                    Page
 7   Cross-Examination by Mr. Gattone:   4
 8
 9                * * * *
10
11
12              EXHIBITS
13   Number   Description            Page
14   (None marked.)
15
16                * * * *
17
```

**Page 3**

```
 1   APPEARANCES:
 2   LAW OFFICE OF PAUL GATTONE
     By PAUL GATTONE, Attorney at Law
 3   312 South Convent Avenue
     Tucson, Arizona  85701
 4   Attorneys for Plaintiffs
 5   AUDILETT LAW, P.C.
     By DARYL A. AUDILETT, Attorney at Law
 6   335 North Wilmot Road, Suite 500
     Tucson, Arizona  85711-2636
 7   Attorneys for Defendants
 8
 9                * * * *
```

BE IT REMEMBERED that pursuant to notice the deposition of ALBERT BACA was taken in the OFFICES OF AUDILETT LAW, P.C., 335 North Wilmot Road, Suite 500, in the City of Tucson, County of Pima, State of Arizona, before Raynbo Silva, RPR, CR, Certified Reporter No. 50014, in and for the County of Pima, State of Arizona, on the 16th day of September, 2019, commencing at the hour of 1:30 P.M. on said day on behalf of the Plaintiffs in a certain cause now pending in the United States District Court, in and for the District of Arizona.

                * * * *

**Page 4**

ALBERT BACA, having been called as an adverse party on cross-examination, having been first duly sworn to state the truth, the whole truth and nothing but the truth, testified on his oath as follows:

CROSS-EXAMINATION
BY MR. GATTONE:

Q. Can I get your name for the record, please?
A. Albert Baca.
Q. And sir, how are you employed?
A. I am employed with the, currently employed with the Tucson Police Department.
Q. And have you had your deposition taken in the past?
A. It's been years, but yes.
Q. So just pretty simple rules. I ask questions. You answer the questions. Please, if we don't talk over each other, it would be great. I'll wait for you to -- if you wait for me to complete an answer -- a question, I'll wait for you to complete an answer, and that way it will be easier for the court reporter.
   If you need to talk to Mr. Audilett, let me know. I'm happy to have that happen.
   How long have you been with TPD?

**Page 5**

A. It will be 11 years in October.
Q. All right. And what is your present position?
A. Currently I'm the supervisor for both the hostage negotiation team and our new community response team, which falls under rapid response.
Q. And what did you do before you worked for TPD?
A. Before TPD I worked for Dun & Bradstreet for a stint. And then prior to that I was with Intuit. It's a small marketing business, accounting software. I was there for about seven years.
Q. No other law enforcement experience other than TPD?
A. Correct.
Q. Sir, have you had any training that's specific to the handling of protest activity?
A. I have.
Q. And what was that?
A. So with the new community response team that we developed we --
Q. Can I ask when that was? I'm sorry.
A. Yeah. It was a little after, I want to say maybe 2017. Yeah. So we developed a team specifically to handle First Amendment demonstrations and things of that nature.
   So we started developing training, looking nationwide on how police departments interacted with their

Page 6

community appropriately in protests and things of that nature.

Prior to that we would do an annual protest type training, which is more just how we would respond as an officer and things of that nature.

Q. And just generally what did you learn about handling protest activity?

A. So in downtown it's different because in downtown where I was a sergeant we developed that type of interaction with all of our, all those that were in public demonstrations or involved in public demonstrations we would try to make contact with an organizer. We would try to monitor any First Amendment demonstrations or peaceful events or things of that nature.

And then from there if the crowd decided to march, we would then follow the crowd or make appropriate arrangements for the crowd to march down the street.

Q. So this was after, did you develop this training after February 16th of 2017?

A. Most of it was developed after. But there was some -- because of the way my lieutenant and I at the time when we developed the downtown district, which was prior to February 16th, our biggest concern were obviously public demonstrations because the majority of those were held, were housed downtown and I just happened to be the sergeant that

Page 7

was on when most of those occurred.

Q. So you developed training materials?

A. Not necessarily materials. But prior to it was just a lot of how can we best approach these type of community demonstrations.

Q. So there's no official protocol or directive in TPD that deals with protest activities; is there?

A. There is now, yes. There is now. After February 16th they developed general orders that require us to do certain steps in order to respond to any type of public demonstration.

Q. Do you know what the number is of those general orders?

A. Not off the top of my head.

Q. Okay. What's the gist of the general orders, if you can summarize it for us?

A. Essentially what it covers is we are going to make contact with, if we can, obviously if it's not impromptu, but if it is impromptu, we'll do our best to make contact with some type of organizer within the demonstration.

We'll monitor the demonstration for both counter-protests. We'll also try to inquire, you know, bearing in mind being appropriate with the groups and make sure they want contact with us but to try to facilitate any type of marching that may occur down around the downtown

Page 8

area specifically or generally.

But that's generally how we respond to those types of events.

Q. Was this --

A. We'll slow it down. Go ahead.

Q. Was this developed in response to what happened downtown in February of 2017?

A. Some of it came from that, but prior to, again, my lieutenant and I because there were so many public demonstrations downtown we really wanted to approach these in a manner that were appropriate. So but a lot of this, a lot of the written down general orders came from February 16.

Q. So there is a written down general order regarding how to handle --

A. Yes.

Q. -- protests of First Amendment activities?

A. Public demonstrations, yes.

Q. And that is in the general, the body of the directives that TPD publishes on its website? Do you know?

A. Yes. I can look them up real fast if you'd like.

Q. Sure. That would be great.

A. Okay. I will be happy to.

MR. GATTONE: We can go off the record for a minute.

Page 9

(Whereupon a discussion was held off the record.)

Q. All right. So I appreciate you trying to find that for me, but you indicated you can find it and you'll email it to Mr. Audilett, he can forward it to me?

A. Yes, sir.

Q. That would be great. Thank you.

Because I'm assuming you don't want him to email me directly.

MR. AUDILETT: As long as he copies me.

Q. All right. Sir, you were on duty 2/16 of 2017; is that correct?

A. Yes, sir.

Q. What was your duty assignment that day?

A. I was the patrol sergeant for the downtown district area.

Q. And what would your duties entail that day?

A. So that particular day we were formulating a 21st century police scene type focus group for the department to introduce the 21st.

So that particular day I went in early for the meeting. We were generating the training materials and how we were going to go forward. I went in a little early. So I went in about 4:00 P.M. My duty shift that time was 5:00 P.M. to 3:00 A.M. the following morning.

And so just general patrol duties with whatever

Page 10

1 calls come out downtown and things of that nature.
2  Q. And you learned at some point that afternoon that
3 there was an immigration related protest taking place in
4 front of the federal building; correct?
5  A. Yes, sir.
6  Q. What time was that, sir?
7  A. It would have been between 4:00 and 5:00 P.M.
8  Q. So you didn't have any knowledge, before knowledge
9 about that taking place?
10  A. No, sir.
11  Q. All right. I already said it was an immigration
12 protest. Was that your understanding at the time was that
13 it was an immigration related protest?
14  A. Not at the time. I assumed with the groups that
15 were mentioned when I received the phone call from the
16 officer that was monitoring --
17  Q. From who?
18  A. There was an officer that was monitoring the
19 protest at the time.
20  Q. All right. So at the time there was not a
21 protocol for how to handle protests but you've told me is
22 now there is.
23  A. So I mean there was a general understanding of how
24 to handle First Amendment demonstrations, public
25 demonstrations, but it wasn't literally written down in

Page 11

1 general orders.
2  Q. All right. But it was -- was it sort of flexible
3 at the time? Or was it just some general understanding you
4 let people do X and not Y?
5  A. It was a general understanding as to we were going
6 to protect First Amendment speeches. So anything related to
7 demonstrations, obviously we're going to allow those folks
8 the right to express themselves accordingly, appropriately
9 downtown keeping in mind safety of everyone involved
10 obviously.
11  Q. So there was no operational plan formulated for
12 the protest that day; is that correct?
13  A. Not for this particular protest, correct.
14  Q. There was a protest -- did a protest take place
15 the next day?
16  A. That's what I was preparing for. So the next day
17 I believe it was the group Tucson Anarchists that were
18 getting ready to protest. There was a social media -- we
19 try to get ahead of any type of protests so that we can talk
20 to those individuals or the organizers through open source
21 type social media.
22   There was a large protest that was going to happen
23 the day after, I think it was the 17th, where they were
24 planning to -- the plan at the time was essentially to
25 destroy downtown and create havoc.

Page 12

1  Q. It didn't quite happen that way, though; correct?
2  A. No because I had time to plan for that and reach
3 out to the organizers and create an operations plan and
4 things of that nature.
5  Q. Was it a smaller demonstration than the one on the
6 16th?
7  A. Yeah. It was about 35, 45 folks, in that area,
8 yeah.
9  Q. Sir, in your supplemental report you indicated
10 that when you learned about the protest at about 4:45 or so
11 that you asked the district units to periodically advise you
12 on their observations and that you would be en route
13 shortly; is that correct?
14  A. Correct.
15  Q. So at the time they were just to observe and let
16 you know what was going on?
17  A. Yes. Yes.
18  Q. So they didn't have any directive regarding
19 whether the protesters could or could not march in the
20 street; is that correct?
21  A. Not at the time, correct.
22  Q. Were you in touch with Officer Green during, well,
23 before you went out to the scene?
24  A. So I believe I was -- I don't remember exactly.
25 When my folks came on, there was a transition of squads. So

Page 13

1 the day shift squad was watching the protest initially, and
2 then my squad started at 5:00 P.M. and had a split squad.
3 So half of them started at 5:00. The other half started at
4 6:00. So I advised the officers, Officer Green, Officer
5 Moreno and Officer Hatch, those are the folks or officers
6 that started at 5:00, to relieve the folks, the officers
7 that were there the day shift.
8   So I think I spoke to Officer Hatch initially just
9 to keep in mind to advise me if they were going to march or
10 if they looked like they were going to march so we get
11 enough resources there to facilitate that.
12  Q. So you didn't direct Officer Green or other
13 officers to prevent them from marching in the street;
14 correct?
15  A. No.
16  Q. I'm assuming, sir, that you, from what you've told
17 me so far that you've worked a number of protests over the
18 years in the downtown area?
19  A. Correct.
20  Q. And now did you -- in January of that year there
21 was the Women's March --
22  A. Uh-huh.
23  Q. -- started from Armory Park.
24   Did you have some involvement with that?
25  A. I did.

## Page 14

1  Q. And they marched in the street; correct?
2  A. Correct.
3  Q. And there was maybe a couple thousand people?
4  A. Oh, yeah, yeah.
5  Q. There was a lot of people there?
6  A. Yeah.
7  Q. It was larger than the protest on 2/16/17;
8  correct?
9  A. Yes. Correct.
10  Q. And do you know if the Women's March had a permit
11  to march in the street?
12  A. I don't, I don't believe they had a permit to
13  march. I believe they had a permit for the park. Don't
14  quote me on that. I don't remember correctly. But we did
15  make contact with the organizers, and they advised us of
16  that, and so we just helped facilitate.
17  Q. So they said we're going to march in the street,
18  and you helped out?
19  A. I don't know if they told us that exactly. I
20  don't remember what the conversation sounded like, but we
21  were just there to help facilitate whatever they were going
22  to decide to do.
23  Q. Sure. But they weren't prohibited from --
24  A. No.
25  Q. -- or they weren't prevented from marching in the

## Page 15

1  street?
2  A. No. No.
3  Q. And I think there was another protest in January
4  of 2017 on Inauguration Day downtown?
5  A. Uh-huh.
6  Q. Do you remember that one?
7  A. Correct.
8  Q. Again, police on the scene. Were you on the scene
9  that day?
10  A. I don't remember if I was on the scene for that
11  particular protest. If I remember correctly, though, these
12  two protests were a coalition of groups who had contact with
13  various groups in there. So they were fairly good at giving
14  us a heads-up, hey, we might be protesting.
15     I don't remember if I was a part of the
16  inauguration protest or not, though.
17  Q. The police didn't stop the inauguration protest
18  from marching in the street but instead provided traffic
19  control?
20  A. Absolutely.
21  Q. Is that correct?
22  A. Yes. When we have enough notice, absolutely. If
23  we can get enough resources there to help out, facilitate
24  any First Amendment speech, we will definitely try our best.
25  Q. But you don't know if this march in the street on

## Page 16

1  Inauguration Day was impromptu or not?
2  A. If I remember correctly, we did have prior notice
3  to that particular protest.
4  Q. That it was going to happen or that they were
5  going to march in the street?
6  A. That it was going to happen, yeah.
7  Q. But not that they were going to march in the
8  street?
9  A. No. What we do is, though, if we have prior
10  notice of any type of public demonstration or First
11  Amendment type of demonstration, what we'll do is we'll get
12  enough resources there so that we can anticipate any type of
13  march.
14  Q. So would you agree that there's been times in your
15  personal experience when the marchers have moved into the
16  street and they were not prevented from doing so?
17  A. Most times we'll get advance notice or we'll talk
18  directly with the organizer and they'll say we might march
19  and they get into the street and we'll provide safety for
20  everyone that's involved.
21  Q. But would you agree that there's some times where
22  it's just sort of impromptu marching in the street?
23  A. Yeah. And most times we have the resources there
24  to facilitate them appropriately.
25  Q. So you had some -- did you have any contact with

## Page 17

1  the event organizers prior to the 2/16/17 event?
2  A. So again, going back to the majority of these
3  public demonstrations will involve some type of coalition.
4  If you're talking about LUPE specifically?
5  Q. Yes, sir.
6  A. I've had -- I tried to reach out to organizers of
7  LUPE, and they have not reached back or talked to us or
8  given us any information. But other groups associated, like
9  the Justice Alliance or Marion Chubon's group or Jim Byrne's
10  group will definitely get in contact with us and kind of
11  give us some of the information.
12  Q. Somebody spoke with Jim on this day; is that
13  correct?
14  A. I did.
15  Q. Was it you?
16  A. Correct.
17  Q. Was it while it was taking place or before it took
18  place?
19  A. I believe it was a little after we had finally
20  made it safe for everyone. Everyone was on the sidewalk. I
21  saw Jim Byrne, a young man that I've worked with quite a few
22  times on protests, and he has my card, my phone number.
23  Yeah, I did speak with him during that time.
24  Q. But again, you didn't direct Officer Green or any
25  of the other officers to prevent people from marching in the

**Page 18**

1  street?
2  A. No.
3  Q. And so you didn't -- did you direct anyone that
4  day to attempt to contact the event organizers to see what
5  their plan was?
6  A. I didn't direct anyone. Normally the first
7  officer -- and that's where, that's where we were
8  implementing some of this new philosophy as to the
9  expectation was that someone make contact with an organizer
10 there, whatever that might be.
11 Q. So but, again, that protocol wasn't in place on
12 2/16/17?
13 A. Not written down, correct.
14 Q. At some point you made your way downtown or to the
15 scene and you heard the officers on the scene were calling
16 for assistance; is that correct?
17 A. Yeah. So once I finished with the 21st century
18 full service policing meeting I received an update that it
19 was still peaceful. And as I was walking down, I started to
20 do some work on the protest that was slated for the
21 following day. And then that's when I heard Officer Green
22 come on the air and ask for urgent assistance.
23 Q. All right. At that point, again, you didn't --
24 well, let me back up for a second.
25      What was the request? What type of assistance?

**Page 19**

1  A. Urgent, what we call a 10 code, 10-84, 10-18. And
2  that's where -- let me step back a bit.
3       So I think I heard on the air they're getting
4  ready to march. And so then almost immediately after that
5  then that's when I heard the urgent call for assistance.
6  Q. But when they called you and said they're starting
7  to march, you didn't say shut it down, you didn't stay stop
8  them from going in the street?
9  A. Oh, no. Not at all.
10 Q. You didn't say any of that?
11 A. No. Just I think -- I don't remember exactly how
12 that conversation went. Just we wanted to get more
13 resources there to help facilitate that.
14 Q. When you arrive on the scene, what did you see?
15 A. When I got on the scene, it was fairly chaotic. I
16 heard, if I remember correctly, a bullhorn, a lot of
17 yelling. There were folks that were on the sidewalks, folks
18 in the middle of the street. There were community members
19 kind of all over the place. There were a few officers that
20 were trying to give me a briefing but trying to make sense
21 of the chaos. There was a lot of yelling going on.
22      There was folks that were near the Tahoe, the
23 police Tahoe that was just east of Granada and Congress,
24 kind of surrounding that.
25      So that's the view that I got into when I got on

**Page 20**

1  scene.
2  Q. All right. How many people do you think you saw?
3  A. In the street or all together?
4  Q. All together.
5  A. All together, 65, 70. That's just kind of a rough
6  estimate.
7  Q. How about people in the street?
8  A. In the street maybe half the group.
9  Q. Okay.
10 A. And those are just rough estimates.
11 Q. I'm sorry?
12 A. Those are just rough estimates.
13 Q. So no one was like making counts or whatever, you
14 were just sort of estimating?
15 A. Correct.
16 Q. I was looking at one of the interviews that was
17 done with you in the aftermath. And you said when you got
18 on the scene you talked -- you told the officers or you told
19 the interviewers that you advised the officers on the scene
20 to in the quote I had was kind of facilitate the movement of
21 the crowd onto the sidewalk so that we could clear the
22 roadway; did I get that correct?
23 A. So when I got on the scene because it was so
24 chaotic I had in my mind, you know, we have to respond to
25 these things fairly quickly and make sure that we're keeping

**Page 21**

1  in mind the safety of everyone, the community especially,
2  innocent bystanders, everyone that's involved.
3       So I had to in my mind create some objectives.
4  And for me, you know, it was the middle of rush hour, so my
5  biggest concern was somebody kind of piling through that
6  crowd and injuring someone. So the community members in
7  large were kind of my main concern.
8       Number two, at the time, and I found out a little
9  information after the fact was that we did have an arrestee
10 in the Tahoe, so that was a second concern of mine, too.
11      I've seen in the past we've had some riots and
12 public demonstrations where they started flipping vehicles.
13 And so I started to worry about maybe the arrestee inside of
14 the vehicle because I didn't really know, I didn't really
15 have a briefing as to what was going on between the officers
16 so and the crowd and then obviously the officers.
17      So there was a lot of things going on that I was
18 concerned about safety-wise. So priorities were to make
19 sure that the arrestee and the folks that were in the street
20 to be safely moved over to the sidewalk so that we could
21 watch for vehicular traffic and at the same time make sure
22 that the arrestee was safe and he wasn't tipped over and he
23 didn't get hurt, at the same time make sure the officers
24 were safe.
25 Q. So that was the first time that you gave the

Page 22

1 officers any direction to direct people to get on the
2 sidewalk; correct?
3   A. Correct. So when I -- if I remember correctly,
4 there was some folks on the Tahoe area. So the first part
5 of that was making sure that we asked, obviously civilly and
6 as best we could for the folks that would to go down to the
7 sidewalk and then we would deal with -- so we could worry
8 about vehicular traffic not intervening. Then we would
9 worry about the arrestee and making sure he was safe.
10  Q. But it is your recollection that you told the
11 interviewers that you told the officers to kind of
12 facilitate the movement of the crowd onto the sidewalk so
13 you could clear the road?
14  A. Civilly, correct.
15  Q. And that was, again, how long after you arrived
16 did you give them that directive?
17  A. That would have been within minutes, within
18 minutes, yeah.
19  Q. But again, that was the first time that there was
20 any directive to the officers on the scene to move people
21 off the sidewalk -- I mean off the street?
22  A. Correct.
23  Q. Were you present when an elderly woman ended up on
24 the ground?
25  A. I was present, but I did not see it.

Page 23

1   Q. Do you have any information on where you were when
2 it happened?
3   A. I don't. I may have been on the west side of the
4 Tahoe. There was some folks that surrounded the other
5 portion. Or I may have been talking to -- I don't remember
6 exactly where I was, but I wasn't in the vicinity when that
7 happened.
8   Q. So you were somewhere in the area, but you did not
9 see what turned out to be Officer Green push the woman to
10 the ground?
11  A. Correct. I did not see that.
12  Q. But you learned in the aftermath that he was
13 accused of pushing her to the ground?
14  A. I did.
15  Q. And you're aware that there was a finding at least
16 by OPS that that was an unjustified use of force?
17  A. Correct.
18  Q. Did you see officer -- I'm sorry. There was also
19 pepper spray was deployed by officers on the scene; is that
20 also correct?
21  A. Correct.
22  Q. And you didn't direct any officers to use their
23 pepper spray; is that correct?
24  A. I did not.
25  Q. Were you present when the pepper spray was

Page 24

1 utilized?
2   A. I got a whiff of it, but I wasn't directly present
3 with them. I think I was talking to or addressing the crowd
4 at that point, trying to look for an organizer.
5   Q. So kind of describe to me where you were at. The
6 Tahoe is in the street?
7   A. Uh-huh.
8   Q. And where were you?
9   A. I would have been on the, I would have been on the
10 south side of the street looking for an organizer possibly.
11  Q. So you didn't see the officers deploy their pepper
12 spray?
13  A. Not directly, correct.
14  Q. But you could smell it? It's sort of wafting from
15 the scene --
16  A. Yeah.
17  Q. -- correct?
18  A. You could get a whiff of it, correct. I was close
19 enough to smell it.
20  Q. I'm sorry?
21  A. I was close enough to smell it, yeah.
22  Q. Did you feel any effects of it?
23  A. I did not.
24  Q. So you're trying to find an organizer. What are
25 you doing?

Page 25

1   A. My hope is that if I can speak to the organizer
2 that we can reasonably have a conversation and he could
3 direct his folks that we could discuss or have a
4 conversation civilly and civilly move off onto the sidewalk
5 so that way it's safe for everyone until I get enough
6 resources there to facilitate whatever's going to move
7 forward.
8   Q. Who did you talk to? Do you know?
9   A. I tried to talk to -- I don't remember names off
10 the top of my head. There was a gentleman with a bullhorn
11 that has been at many protests. I believe he's part of
12 LUPE. I tried to talk to him. He wasn't talking with me.
13 That's when I saw Jim Byrne, so I tried to talk to Jim a
14 little bit. And then he wasn't really giving me a lot of
15 information. I think they were upset about what had
16 transpired so they weren't --
17  Q. They were upset about people getting pepper
18 sprayed, someone getting arrested or all of the above?
19  A. Probably the arrest and how things were
20 transpiring or things that were going on. So it was
21 difficult to find someone that was going to have a
22 conversation with me.
23  Q. Do you know how many officers utilized pepper
24 spray that day?
25  A. I believe two.

**Page 26**

1  Q. And did you do anything to stop the use of the
2  pepper spray or you just knew that it happened?
3  A. I knew that it happened.
4  Q. But again, you didn't direct anybody to use pepper
5  spray or --
6  A. Correct.
7  Q. -- spray the crowd? All right.
8  Later you learned I'm assuming that Officers Green
9  and Guevara had used pepper spray on individuals on the
10 scene?
11 A. Correct.
12 Q. Do you know how many people Officer Green may have
13 sprayed?
14 A. I do not. I don't have the exact number of who
15 was sprayed or not.
16 Q. Did you subsequently find any, get any numbers?
17 A. So what I tried, what I tried to do at the end was
18 because I knew there was going to be various complaints just
19 from talking to some of the folks that were there, I tried
20 to create an area where our internal investigation or
21 Internal Affairs, Office of Professional Standards, could
22 take those complaints. And the folks did not want to give
23 the information at that time. So I didn't have an exact
24 number of who was sprayed or anything of that nature.
25 I think I also called paramedics to the scene so

**Page 27**

1  that if anyone needed medical treatment they would have it
2  available to them.
3  Q. Do you know how many people Officer Guevera may
4  have sprayed?
5  A. I do not.
6  Q. Did you take the use of force report from people?
7  Or how was that handled?
8  A. No. So I had the, I believe it was the A.C., the
9  assistant chief, near me at the time. And I felt --
10 Q. Who was that?
11 A. Kevin Hall, Assistant Chief. And we felt just
12 kind of bouncing some things off of each other, I think we
13 felt that the best way to handle it, it was still kind of in
14 flux, but the best way at the time was to get Office of
15 Professional Standards out or I.A. at the time to take any
16 complaints and to complete the use of force.
17 I didn't have the answer that particular night so
18 I was waiting to see if they wanted me to take the use of
19 force, so because I knew that it might go to our Internal
20 Affairs office I ceased on reviewing video footage or
21 anything of that nature until I got the word that I was
22 going to do the use of force.
23 Q. Indeed were there some complaints?
24 A. I believe there were. I believe that I assigned
25 Sergeant Mesa to take -- at least gather some names of those

**Page 28**

1  that wanted to take complaints at the time. But I don't
2  recall specifically what those complaints were or if they
3  were ever reported at the time.
4  Q. At this point you don't remember, you don't
5  remember who may have registered a complaint that day?
6  A. No. Not that, not that day. I left it open for,
7  and I believe I talked to some, some of the folks there like
8  there's an option, we're going to push it away from the
9  scene, I've invited our, some sergeants out from that office
10 to take those complaints.
11 And I don't know. I never followed up to see if
12 there were any that were actually taken that night.
13 Q. So you don't know if any were filed --
14 A. I don't.
15 Q. -- that day?
16 A. Correct.
17 Q. Do you know if any were filed subsequently?
18 A. I do not.
19 Q. You stated a couple of times in your interview
20 that historically you have given groups the road and that
21 you have managed vehicular traffic?
22 A. And pedestrian, correct.
23 Q. Is that correct?
24 A. Correct.
25 Q. So historically I guess at least in your

**Page 29**

1  experience groups have been allowed to march in the street
2  and TPD has facilitated that by managing traffic?
3  A. Yeah. We did our best. As long as we have the
4  resources because obviously at the end of the day I got to
5  make sure everyone's safe.
6  So if I only have two officers there, you know, I
7  do my best to ask can you just wait for me to get at least
8  six or seven more to help facilitate that march?
9  And most of the times folks are real yeah, we'll
10 wait a few more minutes. You know what I mean? Not
11 necessarily trying to condone to what we're asking but just
12 so that we can safely manage both vehicular traffic and the
13 folks that were marching.
14 Q. Do you know if you did that on 2/16 of '17, asked
15 anybody, directed any of the officers to ask people to wait
16 until more officers came?
17 A. No because by the time they started to march
18 almost it was just a few, maybe even a minute that Officer
19 Green came on the air asking for emergency assistance.
20 When I later responded, I found that they were
21 making the arrests at that particular time. So that's why
22 it might have sparked the community members to do -- or that
23 chaos ensued.
24 But my plan was when I heard that they were
25 starting to march was to immediately get out there and start

## Page 30

1  requesting units to get there so that we could facilitate
2  the march. That was my plan initially.
3      Q. And you walked over there from the main station?
4      A. To my car.
5      Q. You took your car?
6      A. Yes, sir.
7      Q. So were you there when I guess some people were in
8  front of the Tahoe, may have had their arms linked or
9  whatever?
10     A. Yes.
11     Q. You were there when that happened?
12     A. Uh-huh.
13     Q. Did you, and did you do -- do you know by sight
14 the elderly woman that was pushed down to the ground? Would
15 you know her if you saw her?
16     A. Now I would after seeing the videos after the
17 fact, but at the time, no. At the time I don't -- I can
18 vaguely remember who was there on the Tahoe or linked up on
19 the Tahoe.
20        I had a lot of safety issues for me. Just I was
21 worried about the arrestee. I was worried about -- and at
22 the time I didn't know that he had been moved, so I was
23 worried about the arrestee. I was worried about vehicles
24 coming into that area and striking maybe one of those folks
25 that were on the Tahoe. I had a lot of issues with that.

## Page 31

1         Also, I had concerns about the officers. So I
2  think I made the decision or I did make the decision to try
3  to move those folks off the Tahoe and onto the sidewalk.
4      Q. But again, you hadn't given anybody directives to
5  move people out of the street prior to that time?
6      A. Correct.
7      Q. You also indicated in your interview that you
8  didn't speak with Officer Guevera after the incident other
9  than to tell him to get his supplement done --
10     A. Correct.
11     Q. -- is that correct?
12        And you didn't speak to Officer Green in the
13 aftermath of the incident either --
14     A. Correct.
15     Q. -- is that correct?
16     A. Correct.
17     Q. How come you didn't speak with them?
18     A. So a few things. Because the Office of Internal
19 Affairs was going to be there and they might -- I kind of
20 felt like it was going to go to a subsequent investigation,
21 so I wanted to keep it as clean as possible, so just really
22 the facts and make sure your reports were done.
23        I had the feeling at the time that they were going
24 to start the investigation that night, so I purposely didn't
25 ask any questions as to direct issues that might have

## Page 32

1  happened or behaviors or anything of that nature.
2      Q. So I think I may have asked about the woman that
3  was shoved. You didn't find out about that until after the
4  fact?
5      A. Correct.
6      Q. Correct?
7      A. Correct.
8      Q. You didn't see her on the scene down on the
9  ground?
10     A. Not to my recollection. I don't remember seeing
11 her on the ground.
12        I may have seen her in the crowd, but not at the
13 time I don't recall seeing her specifically.
14     Q. Do you know if any of the people who were pepper
15 sprayed were people that were trying to come to her
16 assistance?
17     A. I do not.
18     Q. And you're aware that there was OPS complaints
19 against Officer Green that were sustained; correct?
20     A. Later on, correct.
21     Q. All right. You had some involvement and at least
22 you were I guess briefly the subject or one of the subjects
23 of an OPS --
24     A. Uh-huh.
25     Q. -- that had to do with giving out information? Or

## Page 33

1  what was that about?
2      A. So at the end of that that was with regards to
3  Officer Green's firearm. I was walking in through -- and I
4  had to jog my memory because the officers were talking,
5  there were some officers that were talking there. And as I
6  was walking through the station to go to my office, I
7  overheard briefly the mention of a possible firearm or
8  something of that nature. That's at the time.
9         I found out later that he didn't have his firearm
10 with him or something. I don't remember exactly what the
11 case was. But that was the subject of that particular
12 interview.
13     Q. And this was after the incident when you were
14 returning to the station?
15     A. Correct. Or it might have been the subsequent
16 week. I think it was the subsequent week.
17     Q. And so the issue was whether people were giving
18 out --
19     A. Whether they were talking about the, whatever the
20 case --
21     Q. The investigation?
22     A. Yeah, the investigation.
23     Q. And they're not supposed to do that?
24     A. Depending on if there was an investigation. I
25 think the week after they still hadn't determined how they

ALBERT BACA
9/16/2019

Page 34

1  were going to proceed. I don't know if they had received
2  complaints yet, so they were kind of waiting to see where
3  they were going to go with that.
4     Q. Right.
5     A. But it's just common practice that if we kind of,
6  at least on my behalf I feel like if it's going to go to an
7  investigation I do my best to keep it clean.
8     Q. Right. And you're aware that Officer Green was
9  terminated at least in part because of his actions during
10 the incident?
11    A. I believe so, yes.
12    Q. Do you know, do you have any information regarding
13 the other people that were arrested on the scene?
14    There was that one individual who was arrested,
15 but other people were also arrested.
16    Are you aware of any other arrests that took place
17 that day?
18    A. There were a few arrests, correct. I don't
19 remember specifically what they were for as based on the
20 officers that issued those arrests.
21    Q. Right. If you could look right there, you happen
22 to have a picture of Joan Cichon.
23    A. Okay.
24    Q. Do you recognize this woman?
25    A. I do not.

Page 35

1     Q. Did you see her on the scene?
2     A. I did not.
3     Q. Do you know if she was a person who was arrested?
4     A. I'm assuming so.
5     Q. Did you find out after she was allegedly -- she
6  was assaulted for -- arrested for allegedly assaulting
7  Officer Green; correct? Is that -- do you understand --
8     A. Yeah. I knew there was an officer that or there
9  was somebody that had assaulted an officer, but I didn't
10 know the details of that, but yeah.
11    Q. Do you know that the charges against her were
12 ultimately dismissed?
13    A. Correct.
14    Q. Were any of the charges -- do you know if all of
15 the charges that people received that day were dismissed?
16    A. I didn't follow up as to whether they were
17 dismissed or not. I heard that some were. I don't know if
18 all of them were dismissed.
19    MR. GATTONE: I might actually be done. Give me a
20 couple minutes.
21    MR. AUDILETT: Sure.
22    (Whereupon a discussion was held off the record.)
23    Q. I'm assuming you've reviewed videos since then?
24    A. Correct.
25    Q. And when you reviewed the videos, were you able to

Page 36

1  see more clearly the incident with the elderly woman being
2  pushed?
3     A. Yes.
4     Q. And you could see Officer Green make contact with
5  her; correct?
6     A. Correct.
7     MR. GATTONE: I think I'm done.
8     MR. AUDILETT: Good deal. We'll read and sign.
9     (Whereupon the deposition was concluded at
10 1:55 P.M.)

_____
ALBERT BACA

* * * *