**WO**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

Lucha Unida de Padres y Estudiantes, et al.,

Plaintiffs,

v.

Unknown Green, et al.,

Defendants.

No. CV-18-00085-TUC-RM

**ORDER**

Pending before the Court is Defendants' Motion for Summary Judgment. (Doc. 48.) Plaintiffs responded in opposition (Doc. 62) and Defendants replied (Doc. 64). For the following reasons, summary judgment will be granted as to Count One and denied as to Counts Two, Three, and Four. The motion will also be denied as to qualified immunity.

**I.      Background**

This action arises out of a protest rally on February 16, 2017 in downtown Tucson, Arizona (the "protest" or the "demonstration"). (Doc. 1 at ¶¶ 36, 39.) Plaintiff Lucha Unida de Padres y Estudiantes ("LUPE"), a grassroots political and community organization dedicated to immigration reform and immigrants' rights, organized the protest. (*Id.* at ¶ 37.) The protest began at 4:30 p.m. in front of the Federal Building; at

1   approximately 5:50 p.m., the protestors began marching across Granada and then east on

2   Congress Street toward Armory Park on South Sixth Avenue. (*Id.* at ¶¶ 39, 42.)

3       The parties agree that the protestors entered the roadway of eastbound Congress as

4   part of the march. (*Id.* at ¶ 43; Doc. 48 at 2.) Tucson Police Department ("TPD") officers

5   intervened to prevent the protestors from entering the roadway, and attempted to move

6   the protestors onto the sidewalk on the south side of Congress Street. (Doc. 48 at 2.) An

7   altercation then commenced between the protesters and some of the TPD officers, the

8   events of which gave rise to this lawsuit. (*See* Docs. 46, 48, 50, 62.) The exact details of

9   what transpired during the altercation are partially in dispute, although the evidence

10  shows, and the parties do not dispute, at least the following facts: At one point, some of

11  the protestors surrounded a police vehicle ("Tahoe" or "police vehicle"). Some of the

12  police officers deployed pepper spray[1] and pushed or shoved some of the protestors.

13  Defendants admit, and the evidence corroborates, that: (1) Defendant Officer Green

14  caused an elderly female protestor to fall to the ground and deployed pepper spray

15  directly toward at least three protestors, and a TPD Office of Professional Standards

16  ("OPS") investigation found that these actions constituted excessive and unjustified use

17  of force (Doc. 46-1 at 79-80); (2) Defendant Officer Guevara twice deployed pepper

18  spray against protestors (Doc. 46-1 at 86; Doc. 48 at 6).

19      Plaintiffs allege in their Response that a "female officer" deployed pepper spray

20  "broadly" into a group on the sidewalk. (Doc. 62 at 5-6.)[2] Officer Guevara testified that

21  Defendant Officer Ewings, a female officer who was present at the protest, had her

22  pepper spray out but did not deploy it. (Doc. 46-1 at 93.) The parties provide conflicting

23  accounts of an altercation between Defendant Green and Plaintiff Joan Cichon; there is a

24  factual dispute over whether Green hit Cichon with the door of his police vehicle and

25  whether Cichon hit Green with the door. (Doc. 62 at 2-3; Doc. 48 at 8.)

26  _____

[1] Also known as OC spray, which stands for oleo capiscum, the type of pepper used in
27  the spray. (*See* Doc. 46-1 at 88.) The Court uses the term "pepper spray" throughout this
Order.
[2] Plaintiff's Complaint alleges that Officers Green and Guevara were the only officers
28  who discharged pepper spray. (Doc. 1 at ¶ 96.)

Defendant Green was the subject of an internal TPD investigation arising from the same events giving rise to this case. (Doc. 63-1.) As part of the investigation, a Critical Incident Review Board ("CIRB") report found that Defendant Green's use of force in three instances was "unjustified" and "out of policy." (*Id*.) Following are some excerpts from the CIRB Chain of Command Review, in which Defendant Green's conduct was reviewed by superior-ranking TPD officers:

> Officer Green displayed extremely poor judgment repeatedly. . . His poor judgment was compounded by his lack of regard for community members. He proceeded as if the protestors were objects to be overcome, not people exercising their First Amendment rights. This approach is antithetical to the calling of police work[.]

> Officer Green's conduct falls into the red range, as severe misconduct, because his actions in this case demonstrate an abuse of his authority as a police officer, comprised of repetitive misconduct. Together his actions serve to undermine trust, public safety, and the professional image of the Tucson Police Department.

> His poor decision-making. . . carried over into his interactions with the protestors. He over-reacted and used force out of proportion to the conduct of the protestors he was dealing with. Several protestors Officer Green dealt with responded poorly, even defiantly, to direction they were given. That said, Officer Green's decisions to knock them to the ground or spray them in the face with [pepper spray] were unwarranted and inconsistent with both departmental policy and training.

(*Id*.) Defendant Green's conduct was found to be "severe misconduct" providing justification for termination. (*Id*.)

## II.    Plaintiff's Claims

The sixteen named Plaintiffs seek damages pursuant to 42 U.S.C. § 1983. Count One seeks damages "against all Defendants for violating [Plaintiffs'] civil rights under color of state law." (Doc. 1 at 25.) In Count Two, Plaintiffs LUPE, Livier, E. Cott, S. Cott, Archuleta, and Fitzgerald seek damages for violations of their First Amendment rights to peaceful assembly and free speech. (*Id*. at 26.)

In Count Three, Plaintiffs Reynolds-Stenson, Rothman, Redgrave, Baker, Cichon, Wyckoff, Dunlap, and Grugan seek damages for violations of their Fourth Amendment

rights to be free from unreasonable search and seizure. (*Id.*) These Plaintiffs (except Plaintiff Redgrave)[3] allege that Defendants Green and Guevara[4] used excessive force by deploying pepper spray against them when they posed no harm to the officers or members of the public. (*Id.*) Plaintiff Cichon also alleges that Defendant Green's act of intentionally striking her with the door of his police vehicle constituted excessive force. (*Id.*)

In Count Four, the state-law claims, Plaintiffs Reynolds-Stenson, Rothman, Redgrave, Baker, Cichon, Wyckoff, Dunlap, and Grugan seek damages for battery pursuant to Arizona state law. (*Id.* at 26-27.) Plaintiff Cichon seeks damages for Defendant Green's alleged act of striking her with the door of his police vehicle. (*Id.* at 27.) Plaintiff Cichon also alleges that Defendant Green falsely accused her of assaulting him on February 16, 2017. (*Id.*) She claims that as a result of these false and malicious allegations, she was charged with the felony offense of aggravated assault and placed into custody at the Pima County Jail. (*Id.*) She claims the charges were dismissed by the Pima County Attorney's Office, and she seeks damages for false arrest and false imprisonment. (*Id.* at 27-28.)

### III.   Deposition Testimony

#### a.   Defendant TPD Officer Eric Hatch #51940

Defendant Officer Hatch testified that he directed protestors to move to the sidewalk after they entered the street and that several obeyed the command and others ignored it. (Doc. 46-1 at 16.) Defendant Hatch testified that he observed the altercation between Defendant Green and Plaintiff Cichon involving the door of the police Tahoe. (*Id.* at 17.) Defendant Hatch also testified that he removed an arrestee, David Leon (not a Plaintiff) from the scene. (*Id.*) Defendant Hatch did not testify as to whether he had physical contact with protestors or deployed pepper spray.

. . . .

---

[3] Plaintiff Redgrave was not pepper sprayed during the altercation. (*See supra* at 15.)
[4] The Complaint states that Officers Green and Guevara were the only officers who discharged pepper spray. (Doc. 1 at 13, ¶ 96.) The remainder of the excessive force claims are only against Defendant Green. (Doc. 1.)

b.  <u>Defendant TPD Officer Alberto Moreno #51098</u>

Defendant Officer Moreno testified that he made contact with arrestee David Leon when he "advised Mr. Leon to move to the sidewalk" and placed his arm in front of Mr. Leon to keep him from walking in the road. (*Id.* at 22.) Defendant Moreno testified that he was hit in the back with Mr. Leon's arm. (*Id.*) He then attempted to arrest Mr. Leon, who refused to put his hands behind his back and attempted to pull away. (*Id.*) Defendant Moreno testified that Defendant Green then assisted him in detaining Mr. Leon in handcuffs. (*Id.*) Defendant Moreno and Defendant Green then placed Mr. Leon in the backseat of the Tahoe. (*Id.*) Defendant Moreno attempted to prevent the protestors from surrounding the Tahoe. (*Id.* at 23.) After Defendant Hatch had removed Mr. Leon from the scene, Defendant Moreno removed the Tahoe. (*Id.*)

c.  <u>Defendant TPD Sergeant Michael Gannon #49562</u>

Defendant Officer Gannon testified that, while attempting to move the crowd of protestors away from the Tahoe, he used "verbal commands along with [] pushing to try to de-escalate the situation to push the crowd away from the patrol vehicle." (*Id.* at 27.) Defendant Gannon testified that he "gave pushes" to the protestors to "get them to move back." (*Id.*) Defendant Gannon testified that he assisted Defendant Officer Dragon in arresting Tanya Blancarte (not a Plaintiff). (*Id.*) Defendant Gannon testified that while he and Defendant Dragon were arresting Ms. Blancarte, she "was taken to the ground" and while on the ground "kicked at" the officers. (*Id.* at 27-28.) He testified that he grabbed her legs and rolled her over onto her stomach to prevent her from kicking at them, then placed her in handcuffs. (*Id.*) Defendant Gannon testified that he "did push people… to get them back on the sidewalk for their safety" but "did not push anyone to the ground." (*Id.* at 28.) He further testified that he did not pepper spray anyone. (*Id.*)

d.  <u>Defendant TPD Officer Jason Dragon #49549</u>

Defendant Officer Dragon testified that he gave verbal command to protestors to move away from the Tahoe, and that he had his pepper spray in his hand but never used it. (*Id.* at 32.) Defendant Dragon testified that, while moving arrestee David Leon from

the Tahoe to another patrol car, he physically guided and "lightly pushed" Mr. Leon, who tried to stop in the roadway and refused to get in the patrol car. (*Id*.) Defendant Dragon testified that Ms. Blancarte had "both her arms wrapped around the front bumper" of the Tahoe and that he and Defendant Green grabbed her arms to "remove her" from the Tahoe. (*Id*.) He testified that, after she was removed from the vehicle, Ms. Blancarte "began to swing her arms" and he was "able to grab one of her arms" and "guide her to the ground." (*Id*.) Once Ms. Blancarte was on the ground she began to kick upward. (*Id*.) Defendant Dragon testified that Ms. Blancarte kicked him in the mouth. (*Id*.) He then grabbed her shoulder, rolled her onto her stomach, and placed her in handcuffs, with the assistance of Defendant Gannon. (*Id*.)

     e.   <u>Defendant Officer Anthony Rodriguez #54038</u>

Defendant Rodriguez testified that, as he was attempting to move protestors away from the Tahoe, he "grabbed a male who was arm in arm with other individuals" and "pulled him away" from the group. (*Id*. at 37.) The male "fell to the ground" and then left the roadway. (*Id*.) Defendant Rodriguez testified that a woman later identified as arrestee Najima Rainey (not a Plaintiff) "was verbally aggressive" and "refused to cooperate" with the officers' commands to move away from the Tahoe. (*Id*.) She "fell to the street and began passively resisting" as Defendant Rodriguez and Officer Carpenter (not a Defendant) attempted to remove her from the roadway. (*Id*.) Defendant Rodriguez testified that Ms. Rainey refused to allow him to grab her arms but that eventually he was able to move her to the sidewalk, where she was detained. (*Id*.) Defendant Rodriguez testified that he was struck on the face by an unknown individual, but was not injured, and that he did not deploy his pepper spray. (*Id*. at 38.)

     f.   <u>Defendant Officer William Merlin #101284</u>

Defendant Officer Merlin testified that his only involvement was maintaining a position on the security line facing south on Congress Street to keep the protestors on the sidewalk. (*Id*. at 42.) He testified that he did not push anyone or use pepper spray. (*Id*.) . . . .

g.  <u>Defendant Officer Scott Wakefield #42231</u>

Defendant Officer Wakefield testified that he "stood by with a group of Fire Department personnel" who were on scene to treat people for pepper spray exposure. (*Id.* at 45.) He testified that he did not use pepper spray or have physical contact with any of the protestors. (*Id.*)

h.  <u>Defendant Sergeant Dain Salisbury #51925</u>

Defendant Salisbury testified that he was an on-duty Special Weapons and Tactics ("SWAT") Supervisor. (*Id.* at 48.) Upon arriving at the scene, he was briefed that the crowd "took to the street and surrounded the officers making an arrest." (*Id.*) He testified that he "was further advised at least three officers were assaulted, and pepper spray was used to disperse the crowd back to the sidewalk." (*Id.*) Defendant Salisbury supervised the arrest and officer rescue team. (*Id.*) He testified that he had no direct contact with any members of the public and did not use pepper spray. (*Id.*)

i.  <u>Defendant Officer John W. Parris #34961</u>

Defendant Officer Parris testified that the protestors were acting "very aggressively" toward the officers and that some were "holding onto the front push bars and bumper area" of the Tahoe police vehicle. (*Id.* at 51.) He testified that he assisted in moving the protestors away from the Tahoe and out of the street. (*Id.*) He "physically directed" people out of the roadway and onto the sidewalk but did not push anyone or deploy pepper spray. (*Id.*) Defendant Parris testified that he saw Defendants Green and Guevara deploy pepper spray. (*Id.*)

j.  <u>Defendant Officer Kelly Ewings #53652</u>

Defendant Officer Ewings testified that she "physically moved" some of the protestors away from the Tahoe "by grabbing them by their arms and pulling them off the vehicle." (*Id.* at 55.) She also gave protestors verbal commands to leave the roadway. (*Id.*) Defendant Ewings testified that at one point she had her pepper spray out and held it at arm's length, but did not deploy it. (*Id.*)

. . . .

### k.   Defendant Officer David Luna #35488

Defendant Officer Luna testified that he maintained a position on the "skirmish line" on the south side of eastbound Congress Street, facing the protestors who were on the south sidewalk of Congress. (*Id*. at 58.) Defendant Luna testified that the purpose of the line was to "keep the protestors on the sidewalk and out of the street, for their own safety and so that eastbound traffic could begin to resume safely." (*Id*.)

### l.   Defendant Officer Paul R. Nickels #100043

Defendant Officer Nickels testified that, upon his arrival on the scene, he was instructed to take custody of Ms. Blancarte. (*Id*. at 61.) He testified that he escorted Ms. Blancarte to his patrol car and transported her to the main TPD station at 270 S. Stone without incident. (*Id*.) He testified that he facilitated Ms. Blancarte obtaining her medication for high blood pressure while she was detained at the police station. (*Id*.) Defendant Nickels testified to statements made by some of the protestors who had been arrested and were detained at the TPD station. (*Id*. at 62.) He testified that he did not question any of the protestors about the protest or their involvement. (*Id*.)

### m.   Defendant Officer Albert Baca #51780

Defendant Officer Baca testified that he was assigned as the patrol sergeant for the downtown district on the day of the demonstration. (*Id*. at 67.) He testified that, after the demonstration, TPD developed a training plan and general orders requiring officers to take certain steps in response to any type of public demonstration that took place downtown. (*Id*.) Prior to February 16, 2017, TPD had no standardized training or plan for dealing with demonstrations like the one giving rise to this lawsuit. (*Id*. at 67-68.) Rather, there was "an annual protest type training" (*Id*. at 67) and a "general understanding" within TPD that the department was going to "protect First Amendment speech[]." (*Id*. at 68.) Defendant Baca testified that TPD would "try to get ahead of protests" by finding out information on social media and then attempting to communicate with organizers ahead of time. (*Id*. at 68.) Defendant Baca further testified that TPD facilitated protestors marching in the street downtown on two prior occasions—the Women's March and the

Inauguration Day demonstration, both in January 2017—despite the fact that those demonstrations had not obtained permits to march in the street and that TPD had no prior notice of their intent or plan to march in the street. (*Id*. at 68-69.)

Defendant Baca described the February 16 protest as "fairly chaotic." (*Id*. at 70.) He testified that what differentiated the February 16 demonstration from the other demonstrations that occurred just a month prior was that TPD did not have any notice that the February 16 demonstration was going to happen. (*Id*. at 69.) Defendant Baca testified that when TPD receives advance notice of a planned demonstration, it sends "enough resources there so that we can anticipate any type of march." (*Id*.) He further testified that his top priorities were making sure the demonstrators and the arrestee inside the Tahoe were safe so that the officers could "watch for vehicular traffic" or "worry about vehicular traffic not intervening." (*Id*. at 70-71.) He testified that he attempted to "speak to the organizer" so that they could "reasonably have a conversation" and "civilly move off onto the sidewalk so that way it's safe for everyone until [he got] enough resources there to facilitate whatever [was] going to move forward." (*Id*. at 71.) He testified that "it was difficult to find someone that was going to have a conversation with me." (*Id*.) Defendant Baca testified that, historically, groups have been allowed to march in the street, and TPD has facilitated that by managing traffic when adequate resources are available. (*Id*. at 72.) Defendant Baca further testified that he was aware of an "OPS finding" that Officer Green pushing an elderly female protestor to the ground was "an unjustified use of force." (*Id*. at 71-72.) He testified that he was aware that Defendants Green and Guevara had deployed their pepper spray but that he did not direct them, or any of the other officers, to do so. (*Id*.)

n. Defendant Officer Ryan Green #51068

Defendant Officer Green testified that he resigned from his position as a TPD officer while under investigation by OPS for his actions taken on February 16, 2017. (*Id*. at 75.) He testified that there were two OPS investigations into his actions, one involving untruthfulness and one involving excessive use of force. (*Id*. at 75, 78.) He testified that

he did not resign in lieu of termination. (*Id.*) He testified that he was discharged from his position but then reinstated by the Merit Commission testimony, and then resigned once reaching ten years of employment as a TPD officer. (*Id.*)

Defendant Green testified that he observed the protestors enter the roadway on eastbound Congress Street and saw that traffic was blocked. (*Id.* at 77.) He testified that he pulled his police vehicle into the road in front of the protestors. (*Id.*) He then motioned and verbally directed the protestors to get back on the sidewalk. (*Id.* at 77-78.) He testified that he made the decision to do this of his own initiative and was not directed to do so by a superior, nor did he consult with a superior before taking actions to get the protestors onto the sidewalk. (*Id.* at 78.) Defendant Green testified that he was on the scene with Defendants Hatch and Moreno at the time. (*Id.*) He testified that Defendant Moreno also tried to get the protestors back on the sidewalk and that he was not sure where Defendant Hatch was. (*Id.*) He further testified that he exited his vehicle when he saw Defendant Moreno struggling to arrest a male protestor. (*Id.*)

Defendant Green's testimony recounts that the OPS investigation into his actions at the demonstration found that at least one of the instances when he deployed pepper spray was excessive and unjustified force. (*Id.* at 79-80.) Defendant Green testified that he sprayed at least three individuals with pepper spray. (*Id.*) Defendant Green further testified that Plaintiff Cichon hit him in the leg with the door of the Tahoe and that she was arrested and charged with aggravated assault, though the charges were later dismissed. (*Id.* at 80.)

Defendant Green's Declaration ("the Declaration") states that he, along with Defendant Officers Hatch and Moreno, observed the crowd of protesters, numbering about 75 people, on the north side of Congress Street across from the federal building. (*Id.* at 178.) The Declaration states that, when they heard one of the protestors announce by bullhorn that they were going to march, Defendant Hatch informed Defendant Baca and Defendant Baca advised him to "let them do their thing as long as they were obeying the law and using the sidewalks." (*Id.*) As the group began going east on Congress, they

moved into the street and overtook all lanes of eastbound vehicle traffic. (*Id*.) The Declaration states that Defendants Green and Hatch pulled their patrol vehicles across eastbound Congress and told the protestors to go to the sidewalk and not obstruct traffic. (*Id*.) It states that Defendant Moreno, who was on a bicycle, pulled up near the median in front of Defendant Green's vehicle. (*Id*.) Defendant Green observed arrestee Mr. Leon shove Defendant Moreno on his back and saw Moreno's body go forward. (*Id*. at 179.)

The Declaration states that Defendant Moreno then placed Mr. Leon under arrest, but that Mr. Leon tried to pull away. (*Id*.) Defendant Green then exited his patrol vehicle to assist Defendant Moreno in arresting Mr. Leon. (*Id*.) The Declaration states that Mr. Leon was pulling his arms away to avoid being handcuffed. (*Id*.) A crowd began to surround them, with 30 to 40 people screaming at the officers to let Mr. Leon go. (*Id*.) A federal police officer, later identified as Anil Pillai, went to help the TPD officers when he saw the crowd surrounding them. (*Id*.) Defendant Green called for emergency assistance. (*Id*.)

The Declaration states that Mr. Leon was placed in the back of Defendant Green's patrol Tahoe, but that Defendant Green was unable to leave the area because of people surrounding the vehicle. (*Id*.)  It states that people were grabbing the front bumper of the Tahoe. (*Id*.) As additional officers arrived, they tried to clear people away from the front bumper. (*Id*.) Defendant Green saw several protestors grabbing the front push bar of the Tahoe and refusing to let go or move. (*Id*.) He then tried to exit the vehicle and, as he tried to open the door, found that Plaintiff Cichon was right next to the door, yelling at him. (*Id*. at 180.) Defendant Green yelled at Plaintiff Cichon to move, and he opened the door slightly but did not slam the door into her. (*Id*.) The Declaration states that Plaintiff Cichon used her body to slam the car door shut on Defendant Green's leg. (*Id*.) Defendant Green pushed the door back open and got out of the car. (*Id*.) Defendant Green placed Plaintiff Cichon under arrest, and she was driven away by another officer. (*Id*.)

The Declaration states that Defendant Baca then arrived on the scene and directed Defendant Green to remove the patrol Tahoe from the area. (*Id*.) Defendant Baca directed

Defendant Green and other officers to get the protestors away from the Tahoe bumper. (*Id*.) Defendant Green assisted other officers, including Defendant Dragon, with removing people from the bumper while giving verbal directions to move away from the vehicle. (*Id*.) He and Defendant Dragon grabbed Tanya Blancarte and had to forcefully take her to the ground after she would not let go of the vehicle. (*Id*.)

The Declaration states that Defendant Green saw an older woman fall to the ground and saw people push forward toward her and other officers. (*Id*.) Defendant Green then sprayed two different people with pepper spray in the face; the spray was effective in getting them to back away. (*Id*. at 181.) Defendant Green witnessed a woman running toward Defendant Rodriguez as he was dealing with another protestor. (*Id*.) Defendant Green also pepper sprayed that woman in the face. (*Id*.)

Defendant Green reviewed the video footage from the federal building camera and from Defendant Parris's body camera. (*Id*.) Defendant Green saw in the video that he impact-pushed a male protestor while at the back of the patrol Tahoe. (*Id*.) He also saw in the body camera footage that when the older woman who had fallen was coming toward him and had her hands in the air, he pushed with one hand against her and she stumbled downward. (*Id*.) He did not impact-push her or mean to shove her backward. (*Id*.) The Declaration states that the woman, who was later identified as Plaintiff Fritzi Redgrave, was in the mix with other protestors who were yelling and refusing orders to get back. (*Id*.)

o. <u>Defendant Officer Adrian Guevara #49552</u>

Defendant Officer Guevara testified that there was no TPD policy or directive in place on February 16, 2017 that prohibited protestors from marching in the street. (*Id*. at 83.) Defendant Guevara testified that he saw Plaintiff Redgrave on the ground but did not see the interaction between Officer Green and Plaintiff Redgrave that caused her to fall to the ground. (*Id*. at 84-85.) Defendant Guevara testified that he believed the OPS investigation found that Defendant Green's pushing of Plaintiff Redgrave to the ground was an unjustified use of force. (*Id*. at 85.)

Defendant Guevera testified regarding the types of scenarios in which deployment of pepper spray would be permitted under TPD's general orders, and he stated that he deployed his pepper spray twice during the altercation. (*Id*. at 85-86.) He testified that one deployment was at a woman wearing a red shirt and holding a megaphone and a cell phone who was about four or five feet away from him and moving toward him. (*Id*. at 86.) He testified that he did not recall the woman hitting him but that when he watched the OPS video of the incident, he saw that she did hit him. (*Id*. at 87.) However, he did not include the touching in his police report or supplement. (*Id*.) He later clarified that she hit him with her body and not an object. (*Id*. at 90.) He further testified that if the woman was saying anything aloud, he was unable to hear it. (*Id*.) He further testified that she was using the megaphone in her hand prior to being sprayed. (*Id*. at 87-88.)

Defendant Guevara then testified regarding his second deployment of pepper spray. (*Id*. at 88.) He testified that when he sprayed the subject, the man was five to six feet away and coming toward him and Defendant Green. (*Id*.) Defendant Guevara testified that, although he believed the man was moving toward him at the time, when he watched the video after the fact, he thought that the man was actually attempting to help a person who was on the ground. (*Id*.) He testified that "remnants" of a stream of pepper spray could potentially negatively affect people standing near an individual who was directly sprayed. (*Id*.) During the deposition, Defendant Guevara viewed some of the video footage (which was also submitted as an exhibit to Defendants' Statement of Facts) and attempted to identify the male who was the second subject he sprayed, but that he was unable to do so. (*Id*. at 90-91.) He further testified that his report included only one instance of pepper spray use and that, at the time he drafted the report, he did not recall the second deployment. (*Id*. at 92.) Defendant Guevara also testified that he tries not to use his pepper spray "at all." (*Id*.) He stated that as a rule he doesn't use it and would prefer to "go hands-on," but that it was "way too chaotic" to do that during the protest. (*Id*.) He testified that the last time he used pepper spray was about eight years before the February 16, 2017 protest; during that incident, he used pepper spray to break up a fight

at the Ronstadt Transit Center. (*Id*. at 93.) In that instance, the subject was fighting with officers and with other civilians. (*Id*.) The subjects who Defendant Guevara sprayed at the protest were not engaging in that type of fighting. (*Id*.) Defendant Guevara testified that Defendant Ewings did not deploy her pepper spray. (*Id*.)

The video footage of the demonstration submitted by Defendants as Exhibits to their Statement of Facts shows the TPD officers primarily directing their attention toward removing demonstrators from the street and keeping them on the sidewalk. (Doc. 50.)

p.   Plaintiff Rolande Diane Baker

Plaintiff Baker testified that the protestors wrapped their arms around the front bumper of the police Tahoe to stop the officers from taking "David [Leon]" to jail. (*Id*. at 96.) She further testified that she saw officers "aggressively" moving women's arms from the Tahoe bumper. (*Id*. at 96-97.) She then clarified that the protestors were linking arms together and were not holding the bumper. (*Id*. at 97.) She testified that Plaintiff Redgrave[5] was one of the protestors linking arms in front of the Tahoe. (*Id*.) Plaintiff Baker testified that an officer pushed Plaintiff Redgrave and then sprayed Plaintiff Baker as she was trying to pick up Plaintiff Redgrave. (*Id*. at 99.) She testified that after that she was "absolutely blinded" and other people helped her move out of the street. (*Id*.) She drove home one-and-a-half hours later. (*Id*.)

q.   Plaintiff Joan Cichon

Plaintiff Joan Cichon testified that she was held in custody overnight in Pima County Jail following the demonstration. (*Id*. at 102.) She further testified that, just before she was arrested, she was standing next to the police Tahoe and "keeping an eye on" arrestee Mr. Leon, who was in the backseat. (*Id*.) She was also taking photographs. (*Id*.) Plaintiff Cichon testified that while she was standing next to the Tahoe, Defendant Green opened the front driver's side door and hit her with it. (*Id*.) She testified that she then made eye contact with him and said, "What are you doing? You hit me with the door." (*Id*.) She further testified that he pulled the door back and hit her again

---

[5] The witness and the attorney refer to Plaintiff Redgrave by her first name, Fritzi. In the interests of clarity and consistency, the Court refers to her as Plaintiff Redgrave.

1    intentionally. (*Id.*) The second time the door hit her, she put up her hands to stop it. (*Id.*)

2    The first time, it hit her in the leg. (*Id.*) The second time, it hit her outstretched hands. (*Id.*

3    at 103.) Plaintiff Cichon testified that Defendant Green exited the Tahoe, and another

4    officer came up behind her. (*Id.* at 103.) They handcuffed her and "dragged her" toward

5    another police car. (*Id.*) She testified that she was taken to the police station on South

6    Stone, and then to the Pima County Jail. (*Id.* at 103-04.) She further testified that the

7    police response to the protest was "very unusual" and "significantly different" than other

8    protests. (*Id.* at 105.)

9          r.   Plaintiff Edward Cott

10         Plaintiff Cott testified that he was marching eastbound on Congress Street when

11   the Tahoe pulled in front of the group of protestors. (*Id.* at 108.) He then went around the

12   front of the Tahoe to continue marching. (*Id.*) He testified that he was at the front of the

13   group and was chanting "immigrants' rights demand justice" through a bullhorn. (*Id.*)

14   Plaintiff Cott testified that he then saw Mr. Leon being "grabbed" by an officer, arrested,

15   and taken into custody. (*Id.*) He further testified that more officers started coming to the

16   scene and that people started gathering around those being arrested, including Najima

17   Rainey (not a Plaintiff). (*Id.* at 109.) He then started telling people to get on the sidewalk

18   if they didn't want to be arrested. (*Id.*) He testified that some people followed the

19   officers' commands to get on the sidewalk, but some did not and got pepper sprayed. (*Id.*)

20   He testified that the demeanor of the police when they were pepper spraying people was

21   "aggressive." (*Id.*) He further testified that he was hit by some of the pepper spray and

22   that it irritated his eyes but that he was able to drive home and go to work the next day.

23   (*Id.*)

24         Plaintiff Cott testified that the decision to march was made at the protest and that

25   the group had not obtained a permit to march in the street. (*Id.* at 111.) He testified that

26   some protests obtain permits prior to marching and others do not. (*Id.*) He further testified

27   that TPD has been aware of prior marches in the streets without permits and that "we've

28   never had an issue with [TPD] before[.]" (*Id.*) Plaintiff Cott testified further as to his

1    perceptions of the events on the day of the protest, including the arrest of Mr. Leon and

2    the protestors standing in front of the Tahoe. (*Id*. at 111-14.)

3           s.  <u>Plaintiff Fiona Grugan</u>

4          Plaintiff Grugan testified that she entered the street as part of the protest march

5    and was in the back of the group. (*Id*. at 117.) She testified that she would have had

6    difficulty hearing instructions or any other verbalizations because of a hearing deficiency.

7    (*Id*.) She testified that she took video footage of the event, which she submitted to the

8    American Civil Liberties Union. (*Id*. at 118-19.) Plaintiff Grugan testified further as to

9    her recollections of the event. (*Id*. at 118-21.) She testified that the people in front of the

10   Tahoe had their arms interlinked but that she did not see them wrapping their arms

11   around the bumper of the vehicle. (*Id*. at 120.) She further testified that she was sprayed

12   with pepper spray while standing on the sidewalk. (*Id*. at 121.) Plaintiff Grugan testified

13   that she inhaled pepper spray when a female police officer who was about ten feet away

14   sprayed broadly.[6] After being sprayed, Plaintiff Grugan went to help Plaintiff Rolande

15   Baker wash out her eyes with water and wipe the pepper spray off her face. (*Id*.)

16          t.  <u>Plaintiff Fritzi Redgrave</u>

17         Plaintiff Redgrave testified that she was 78 years old at the time of the events

18   giving rise to this case. (*Id*. at 124.) She was nearby when Mr. Leon was being arrested,

19   and she briefly joined the group of protestors that was linking arms in front of the Tahoe

20   after Mr. Leon had been put in the back seat. (*Id*. at 125-27.) She testified that "people

21   were shoving" and it was "too rowdy" for her, so she stepped away from the vehicle and

22   from the people linking arms. (*Id*.) She described some of the protestors as being too

23   "militant" and "rude" for her liking, which made her want to leave. (*Id*. at 128-29.) She

24   further testified that she saw a woman, who she identified as Mr. Leon's mother, "being

25   taken down in a chokehold" by officers. (*Id*. at 130.) Plaintiff Redgrave testified that,

26   because she is a nurse, she wanted to see if the woman was okay. (*Id*.) She moved toward

27   an officer or officers, shaking her finger at them because she was protesting the woman

28   _____

[6] Plaintiffs' Complaint does not include allegations of excessive force by any police officers other than Defendants Green and Guevara.

"being taken down in that manner." (*Id*.) She testified that she only moved toward the officer because she was trying to get around him to get to the woman on the ground. (*Id*.) At that point, Plaintiff Redgrave was pushed to the ground. (*Id*.) She was not physically injured, and she was not pepper sprayed. (*Id*.) She described being pushed to the ground as "pretty stunning." (*Id*.)

u.   Plaintiff Heidi Reynolds-Stenson

Plaintiff Reynolds-Stenson testified that she was present at the protest as a legal observer with the National Lawyers Guild. (*Id*. at 133.) She testified that the demonstration started out calm and orderly. (*Id*. at 134.) She later heard yelling, went toward it to see what was happening, and saw Mr. Leon being arrested and people around him asking why he was being arrested. (*Id*.) Plaintiff Reynolds-Stenson testified that she had attended previous protests where people marched in the streets and that they would typically be escorted by police. (*Id*. at 135.) She further testified that she had attended protests where people marched in the street without being escorted by police. (*Id*.) She testified that the February 16, 2017 protest was the only one she had seen where marching in the street caused problems. (*Id*.) She described the protest as "relatively small" and with a lot of older people and families present. (*Id*. at 136.) She further testified that when she had her cell phone out to film what was going on while Plaintiff Redgrave was on the ground, Defendant Green saw that she was filming and pepper sprayed her. (*Id*. at 137.) She testified that she was not in the street when she was sprayed, but that she was trying to get as close as she could to film. (*Id*.) She further testified that she had been indirectly sprayed before receiving the direct spray. (*Id*.)

Plaintiff Reynolds-Stenson testified that she had not previously attended a protest where pepper spray had been deployed. (*Id*. at 138.) She further testified that the first time she witnessed the officers use spray was on Plaintiff Baker when she was trying to help Plaintiff Redgrave up off the ground. (*Id*.) She testified that when she heard officers telling people to get out of the street, she moved to the median and tried to stay out of the way while continuing to film. (*Id*. at 139-40.)

1

2    v. <u>Plaintiff Josh Dunlap</u>

    Plaintiff Dunlap testified that he was next to David Leon and the front door of the

3 Tahoe when Mr. Leon was arrested. (*Id*. at 145-47.) He remembered being pulled to the

4 ground and then realizing that Plaintiff Redgrave had been knocked to the ground nearby.

5 (*Id*. at 147.) He went to try to lift her up and then was pepper sprayed. (*Id*.) He testified

6 that he was with Plaintiff Wyckoff, attempting to help Plaintiff Redgrave, when he was

7 sprayed. (*Id*.) He further testified that he then moved to the sidewalk and attempted to

8 figure out how to alleviate the pain from the pepper spray for himself and other

9 protestors. (*Id*. at 148.)

10    w. <u>Plaintiff Linda Rothman</u>

    Plaintiff Rothman testified that she never heard officers directing protestors to get

11 out of the street and move to the sidewalk. (*Id*. at 151.) She testified that she saw Officer

12 Green push Plaintiff Redgrave to the ground. (*Id*.) She testified that she was pepper

13 sprayed twice while she was turning around to leave the area. (*Id*.)

14

15    x. <u>Plaintiff Alexander Wyckoff</u>

    Plaintiff Wyckoff testified that David Leon was "just walking along" when he was

16 detained and cuffed by the police. (*Id*. at 154.) He testified that people then gathered

17 around the Tahoe, and he observed more people being detained and cuffed. (*Id*.) He

18 described Plaintiff Redgrave as trying to deescalate the situation and calm everyone

19 down. (*Id*.) He saw one of the officers push her away and saw her fall. (*Id*.) He testified

20 that he saw her head hit the ground "pretty hard" and that his instinct was to help her.

21 (*Id*.) He testified that, because he was worried for her safety, he inserted himself between

22 her and the police and then was pushed and pepper sprayed. (*Id*.) He continued to try to

23 help Plaintiff Redgrave up and was pepper sprayed "at least one or two more times." (*Id*.)

24 He testified that he was able to see again about half an hour after being sprayed and that

25 the initial intensity subsided in about an hour. (*Id*. at 155.)

26

27 . . . .

28 . . . .

y.  LUPE Organizer Zaira Livier

Zaira Livier (not a Plaintiff) testified regarding the protest and the nature and organizational structure of LUPE. (*Id*. at 9.) She testified that the purpose of the protest was to stand in solidarity with migrants against Immigration and Customs and Enforcement raids, detention, and deportation. (*Id*.) Ms. Livier was part of the organizing team for the February 16, 2017 protest. (*Id*.) She testified that LUPE is a political action committee in Tucson that is a collective of volunteers. (*Id*.) LUPE focuses on popular education, popular mobilization, cultural events, talks, and community outreach and support. (*Id*.) She testified that the protest was a LUPE-sponsored event and that she has helped organize protests for LUPE before. (*Id*. at 10.) There is no real structure to LUPE, it is just a collective of people. (*Id*.) There is no president, no board of directors, and no funding. (*Id*.)

Ms. Livier testified that the protest was held at a particular time and place to increase its visibility. (*Id*.) She testified that LUPE did not give the City of Tucson or TPD notice that the protest was going to occur. (*Id*.) There was a Facebook event created for the protest. (*Id*.) She testified that migrants' rights organizers in Tucson typically do not inform the police of their protests ahead of time because undocumented people and families are often present. (*Id*. at 11.) She testified that TPD often finds out about protests ahead of time anyway and that they have been doing that since the February 16, 2017 demonstration. (*Id*.) She testified that she was not aware that a permit from the City of Tucson was required in order to march in the street. (*Id*. at 12.) She further testified that, although she was not directly sprayed, she was affected by pepper spray and that the effects lasted for a few hours. (*Id*. at 13-14.)

## IV.   Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The movant bears the initial responsibility of presenting the basis for its motion

1    and identifying those portions of the record, together with affidavits, if any, that it

2    believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at

3    323.

4         If the movant fails to carry its initial burden of production, the nonmovant need

5    not produce anything. *Nissan Fire & Marine Ins. Co. v. Fritz Co.*, 210 F.3d 1099, 1102–

6    03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to

7    the nonmovant to demonstrate the existence of a factual dispute and show (1) that the fact

8    in contention is material, i.e., a fact that might affect the outcome of the suit under the

9    governing law, and (2) that the dispute is genuine, i.e., the evidence is such that a

10   reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby*,

11   *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d

12   1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact

13   conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–

14   89 (1968); however, it must "come forward with specific facts showing that there is a

15   genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

16   587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

17        At summary judgment, the judge's function is not to weigh the evidence and

18   determine the truth but to determine whether there is a genuine issue for trial. *Anderson*,

19   477 U.S. at 249. In its analysis, the court must accept the nonmovant's evidence and

20   draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only

21   the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P.

22   56(c)(3).

23   **V.    Count One: 42 U.S.C. § 1983**

24        Defendants move for summary judgment on Count One. (Doc. 48 at 8.) In Count

25   One, Plaintiffs claim damages under 42 U.S.C. § 1983 "against all Defendants for

26   violating their civil rights under color of state law." (Doc. 1 at 25.)

27        Section 1983 provides that:

28        Every person who, under color of any statute, ordinance,
          regulation, custom, or usage, of any State or Territory or the

District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law[.]

Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393-94 (1989). As Count One does not state what federal laws or rights were violated by Defendants' alleged misconduct, it fails to state a claim. Summary Judgment is granted as to Count One.

## VI.   Count Two: First Amendment Violations

Defendants move for summary judgment on Count Two, which alleges that Defendants violated Plaintiffs' First Amendment rights to free speech and peaceful assembly. (Doc. 48 at 9.) Defendants argue that "there is no evidence that any of the Defendants interfered" with the speech of any Plaintiffs. (*Id.*) They argue that none of the Defendant TPD officers forced any of the protestors to stop or curtail their speech. (*Id.*) They further argue that the video evidence shows that, even after the protestors were moved out of the roadway to the sidewalk, they continued to express themselves vocally without interference. (*Id.* at 10.)

Defendants also argue that they did not infringe on Plaintiffs' First Amendment right to peacefully assemble. (*Id.*) Defendants contend that the February 16, 2017 protest was "unruly" and "not peaceful" and therefore was not protected by the First Amendment. (*Id.*) Defendants contend that the protestors' occupation of eastbound Congress Street during rush hour created a "public safety problem, exposing the protestors to danger from being injured by moving vehicles." (*Id.*) They contend that Defendants "took legitimate action to restore public safety [and the] safety of the protestors[.]" (*Id.*) Defendants contend that they each made "reasonable attempts" to "quell the unruly, unlawful, and unsafe gathering in the middle of Congress [Street]" and in doing so accomplished their goal of safely moving the protestors out of the street. (*Id.* at 13-14.)

The Plaintiffs named in Count Two maintain that Defendants' actions violated their First Amendment rights to free speech and peaceful assembly. (Doc. 62 at 8.) Plaintiffs contend that they were clearly involved in First Amendment activity on February 16, 2017. (*Id*. at 10.) Plaintiffs also contend that they "were aware that other recent protests had used the public roadway to express their concerns and grievances" and that TPD "had not only not hindered [those] marches but had directed traffic so that the marches could proceed safely." (*Id*.) In his deposition, Defendant Sergeant Baca testified that TPD had facilitated prior protests by providing traffic control even when those protests were conducted in the street and without a permit. (*Id*.) On February 16, 2017, however, Plaintiffs allege that "Defendants intervened to stop the protest march after it had barely started." (*Id*.) Plaintiffs contend that the protest only became "unruly" because of Defendants' actions to stop the march. (*Id*.) Plaintiffs contend that, had Defendants provided traffic control and direction, the protest would have proceeded without problems, but instead "Defendants made the decision to stop Plaintiff's protected First Amendment activity." (*Id*. at 11.)

"[S]peech on public issues occupies the "highest rung of the hierarchy of First Amendment values and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983). "[S]peech on matters of public concern is at the heart of the First Amendment's protection." *Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011) (internal quotations omitted). "The First Amendment reflects a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Id*. at 452. Political speech, especially that involving controversial issues, is "the essence of First Amendment expression." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995). The First Amendment "requires that one be permitted to advocate what he will unless there is a clear and present danger that a substantial public evil will result therefrom." *Dennis v. United States*, 341 U.S. 494, 508 (1951).

The First Amendment protects demonstrations and protest marches in public spaces. *See N.A.A.C.P., W. Region v. City of Richmond*, 743 F.2d 1346, 1355 (9th Cir.

1984). "Public streets are the prototypal example of a public forum." *Id*. Restrictions on First Amendment activities in public fora, such as ordinances that restrict access to streets, are subject to a "particularly high degree of scrutiny." *Id*.

"Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association." *NAACP v. Alabama*, 357 U.S. 449, 460 (1958); *see also Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984) ("An individual's freedom to speak. . . and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed."). Thus, the First Amendment protects the "freedom to associate with others for the common advancement of political beliefs and ideas." *Kusper v. Pontikes*, 414 U.S. 51, 56–57 (1973). However, the right to associate is not absolute. *Perry v. Schwarzenegger*, 591 F.3d 1126, 1139 (9th Cir. 2009). "Infringements on that right may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Roberts*, 468 U.S. at 623. "The government must justify its actions not only when it imposes direct limitations on associational rights, but also when government action 'would have the practical effect of discouraging the exercise of constitutionally protected political rights." *Schwarzenegger*, 591 F.3d at 1139 (internal citations and quotations omitted). "Such actions have a chilling effect on, and therefore infringe, the exercise of fundamental rights." *Id*. "Accordingly, they must survive exacting scrutiny." *Id*.

Drawing all inferences in Plaintiffs' favor, the Court finds that Plaintiffs have carried their burden to demonstrate the existence of a genuine factual dispute regarding whether Defendants' actions on February 16, 2017 unlawfully restricted their rights to speech and assembly in violation of the First Amendment. Plaintiffs claim that Defendants interfered with the exercise of their First Amendment rights when Defendants entered the road to block the march from proceeding and attempted to direct the

protestors to the sidewalk. Defendants do not contest that they attempted to block the march from proceeding down Congress Street and attempted to direct the protestors to the sidewalk. Rather, Defendants describe the protest as "unruly" and "not peaceful" and argue that the nature of the protest justified their involvement. Plaintiffs describe the protest rally as a "peaceful" march that only became "unruly" when Defendants became involved. The parties' differing accounts of the protest present a factual dispute over whether the protest was "unruly" and "not peaceful," so as to potentially justify Defendants' actions, or whether, as Plaintiffs claim, the protest was peaceful prior to Defendants' involvement and whether it was Defendants' actions that caused the protest to become "unruly."

Furthermore, Defendants have not argued that Plaintiffs' speech or assembly presented a "clear and present danger of substantial evil" that would justify restriction. Nor have they satisfied the "exacting scrutiny" that applies to government infringements on the right to political assembly by showing that the restrictions Defendants placed on Plaintiffs' assembly were due to "regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." Furthermore, a reasonable factfinder could conclude that there existed "means significantly less restrictive of associational freedoms" by which Defendants could have protected public safety in these circumstances. Viewing the facts in the light most favorable to Plaintiffs, a reasonable factfinder could conclude that the protest was peaceful and only became unruly because of the way in which Defendants intervened. Drawing all factual inferences in Plaintiffs' favor, a reasonable factfinder could conclude that Defendants violated Plaintiffs First Amendment rights. Therefore, summary judgment is denied as to Count Two.

### VII.   Count Three: Fourth Amendment Violations

Defendants move for summary judgment on Count Three, which alleges that Defendants Green and Guevara's use of force against Plaintiffs was excessive and unreasonable in violation of the Fourth Amendment. (Doc. 48 at 14.) Defendants argue

that the protestors in the street were violating state statutes prohibiting (1) obstruction of a highway or other public thoroughfare; (2) disorderly conduct; (3) unlawful assembly; and (4) riot.[7] (*Id.* at 15); A.R.S. §§ 13-2906, 13-2904, 13-2902, 13-2903. Defendant Green argues that his actions toward Plaintiffs Redgrave and Cichon were objectively reasonable as a matter of law pursuant to *Graham v. Connor*, 490 U.S. 386 (1989).  (*Id.* at 16, 18.) Defendants Green and Guevara argue that their use of pepper spray on Plaintiffs Reynolds-Stenson, Rothman, Baker, Cichon, Wyckoff, Dunlap, and Grugan was also reasonable under the circumstances. (*Id.* at 16-18.)

Plaintiff Redgrave maintains that Defendant Green's use of force against her, which resulted in her falling to the ground, was objectively unreasonable under the circumstances. (Doc. 62 at 11.) Plaintiff Cichon maintains that Defendant Green's use of force against her when he pushed the door of the Tahoe against her leg was excessive under the circumstances. (Doc. 1 at 26.) Plaintiffs Reynolds-Stenson, Rothman, Baker, Cichon, Wyckoff, Dunlap, and Grugan maintain that Defendants' use of "pepper spray was unnecessary to subdue, remove, or arrest the protestors," that the repeated use of pepper spray was unnecessary and the way it was used was objectively unreasonable, and that "it would be clear to a reasonable officer that it was excessive to use pepper spray against nonviolent protestors under these circumstances." (Doc. 62 at 11, 15.)

Claims of excessive force by law enforcement officers are analyzed under the Fourth Amendment's "objective reasonableness" standard. *Graham*, 490 U.S. at 395. "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. "The reasonableness inquiry in an excessive force case is an objective one: the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Id.* at 396-7. The reasonableness

---

[7] Defendants have presented no evidence that any of the Plaintiffs was ever charged with or cited for violating any of these statutes.

1   standard must allow for the fact that "police officers are often forced to make split-second

2   judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the

3   amount of force that is necessary in a particular situation." *Id*. at 397. "The question is

4   whether the totality of the circumstances justifies a particular sort of seizure." *Id*. at 396.

5   The proper application of reasonableness under the Fourth Amendment "requires careful

6   attention to the facts and circumstances[.]" *Id*.

7          "Determining whether the force used to effect a particular seizure is reasonable

8   under the Fourth Amendment requires a careful balancing of the nature and quality of the

9   intrusion on the individual's Fourth Amendment interests against the countervailing

10   governmental interests at stake." *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011)

11   (citing *Graham*, 490 U.S. 386)). This test can be applied by "first considering the nature

12   and quality of the alleged intrusion" and then considering "the governmental interests at

13   stake by looking at (1) how severe the crime at issue is, (2) whether the suspect posed an

14   immediate threat to the safety of the officers or others, and (3) whether the suspect was

15   actively resisting arrest or attempting to evade arrest by flight." *Id*. (citing *Deorle v.

16   Rutherford*, 272 F.3d 1272, 1279–80 (9th Cir. 2001)). These factors, however, are not

17   exclusive and courts are to examine "the totality of the circumstances and consider

18   whatever specific factors may be appropriate in a particular case, whether or not listed in

19   *Graham*." *Id*. (citing *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir.2010)).

20          Drawing all inferences in Plaintiffs' favor, the Court finds that Plaintiffs have

21   carried their burden to demonstrate the existence of a genuine factual dispute involving

22   Defendant Green and Guevara's use of force during the February 16, 2017 protest. There

23   are factual disputes concerning whether Plaintiff Redgrave stumbled and fell to the

24   ground or was pushed to the ground by Defendant Green, and whether she posed any

25   threat at the time.  Plaintiff Redgrave testified that Defendant Green forcibly pushed her

26   to the ground when she posed no threat to him. Defendant Green testified that he saw

27   Redgrave fall to the ground and he "did not impact-push her," but upon reviewing video

28   footage of the incident, he saw that "he pushed with one hand against her and she

stumbled downward." Plaintiff Redgrave testified that she was 78 years old at the time the incident occurred. *See Pena v. City of Rio Grande City, Texas*, 2020 WL 3053964, at *6 (5th Cir. June 8, 2020) (age and non-threatening nature of victim can be considered in determining whether force was excessive). Viewing these facts in the light most favorable to Plaintiff Redgrave, a reasonable factfinder could conclude that Defendant Green violated Plaintiff Redgrave's Fourth Amendment rights by pushing her to the ground when she posed no threat.

A similar analysis holds for Plaintiff Cichon's allegations. Plaintiff Cichon testified that Defendant Green pushed the vehicle door against her while she was standing next to the vehicle, posing no threat to him, and that she held up her hands only to protect herself from being hit by the door. Defendant Green testified that Cichon pushed the door against him, causing him to arrest her for assault. Viewing these disputed facts in the light most favorable to Plaintiff Cichon, a reasonable factfinder could conclude that Defendant Green violated her Fourth Amendment rights by hitting her with the vehicle door.

Plaintiffs Reynolds-Stenson, Rothman, Baker, Cichon, Wyckoff, Dunlap, and Grugan maintain that the pepper spray deployed against them was unnecessary and excessive under the circumstances because they were protesting in a nonviolent manner. The parties dispute whether the nature of the protest was peaceful or whether it was unruly so as to justify the Defendants' intervention. Viewing the facts in the light most favorable to Plaintiffs, a reasonable factfinder could conclude that the protest was peaceful and only became unruly because of the way in which Defendants intervened. Viewing the facts in this light, a reasonable factfinder could conclude that Defendants Green and Guevara's use of pepper spray—including the way they used it (direct spraying to the face), spraying individuals without first giving specific verbal direction to those individuals, spraying individuals who posed no immediate threat to the officers, and repeated spraying—was unreasonable under the circumstances.

Defendants have alleged that Plaintiffs were violating the law by blocking the roadway and obstructing traffic, and that Plaintiffs' actions posed a threat to public safety. While the government has an interest in enforcing laws and maintaining safe roadways, there is no evidence that anyone who participated in the February 16, 2017 protest was charged with a criminal violation for obstructing traffic, and the Court does not find that Plaintiffs' actions posed an immediate threat to the safety of officers or others.  The greatest threat posed by Plaintiffs' conduct in walking in the roadway was to the safety of the Plaintiffs themselves.

Moreover, Defendants' deposition testimony does not indicate that the officers were in immediate fear for their own safety or the safety of other officers. The testimony refers to protestors moving toward the officers prior to being pepper sprayed, but it does not recount any identifiable threats to officer safety. And while Defendants have indicated that some officers may have felt intimidated when the protestors began to surround the Tahoe police vehicle after Mr. Leon was arrested and taken into custody, the evidence does not show that any of the Plaintiffs were armed, that any of the Plaintiffs intended or attempted to inflict bodily harm on any of the officers,[8] or that any of the Plaintiffs took any actions to place the officers in physical danger. Finally, there are no indications or allegations that any of the Plaintiffs were attempting to resist arrest. The Court notes that non-party Mr. Leon, who allegedly shoved Defendant Moreno and then resisted arrest, and non-party Ms. Blancarte, who allegedly kicked some of the Defendant Officers while being arrested, were apparently neither pushed to the ground nor pepper sprayed.

Also relevant in considering whether the use of force was reasonable within the totality of the circumstances are the conditions under which the events giving rise to the claims took place. The February 16, 2017 protest was a political demonstration for immigrants' rights in the context of highly contentious public debates and government

---

[8] The Court acknowledges that the facts surrounding the altercation between Plaintiff Cichon and Defendant Green are in dispute; however, even accepting Defendants' presentation of those facts as true, there was no indication that Plaintiff Cichon attempted or intended to harm Defendant Green or that she actually did.

policies around that issue. As this type of political speech and assembly is rigorously protected by the First Amendment, a reasonable officer would have given more deference to the protestors' exercise of their First Amendment rights under those circumstances.

Summary judgment is denied as to Count Three.

### VIII. Count Four: State-Law Claims for Battery and False Arrest and Imprisonment

Defendants move for summary judgment on Count Four, in which Plaintiffs Reynolds-Stenson, Rothman, Redgrave, Baker, Cichon, Wyckoff, Dunlap, and Grugan allege state-law claims for battery and Plaintiff Cichon alleges state-law claims for false arrest and false imprisonment. (Doc. 1 at 26-7; Doc. 48 at 19.)

### a. Battery

Defendants argue that summary judgment should be granted as to Plaintiffs' state-law battery claims because Defendants Green and Guevara's use of force was objectively reasonable under the circumstances. (Doc. 48 at 19.)

A person commits battery if he acts with intent to cause harmful or offensive contact, or apprehension thereof, and the contact occurs. *Garcia v. United States*, 826 F.2d 806, 810 n. 9 (9th Cir. 1987); *see also Hulstedt v. City of Scottsdale*, 884 F. Supp. 2d 972, 1016 (D. Ariz. 2012) (Defendant police officers liable for battery). "[A] suit for a police officer's use of excessive force necessarily involves the intentional tort of battery." *Ryan v. Napier*, 245 Ariz. 54, 60 n. 2, 425 P.3d 230, 236 (2018). Defendants have not invoked the justification defense set forth in A.R.S. § 13-409 regarding the battery claims. *See id*. at 57.

As discussed *supra*, Plaintiffs have presented a genuine dispute of material fact regarding whether Defendants Green and Guevara used excessive force against Plaintiffs. Defendants have not carried their burden to show that there is no genuine dispute of material fact and that they are entitled to judgment as a matter of law on the battery claims. Therefore, summary judgment as to Count Four: Battery is denied.

. . . .

1

### b.  False Arrest and Imprisonment

Defendants further argue that summary judgment should be granted as to Plaintiff Cichon's false arrest and false imprisonment claims because the video evidence shows that Plaintiff Cichon pushed the Tahoe door back against Defendant Green and therefore there was probable cause for Defendant Green to arrest and detain Plaintiff Cichon for assault. (*Id*.) Plaintiff Cichon contends that Defendant Green intentionally hit her with the door. (Doc. 62 at 18.) She alleges that when he then attempted to hit her with the door a second time, she put her hands up to protect herself and was falsely accused of pushing the door into Defendant Green's leg. (*Id*.) Cichon was arrested for a felony and spent the night in jail; the felony charges were later dismissed. (*Id*.)

"Under Arizona law, the intentional torts of false arrest and false imprisonment differ only in terminology and are defined as 'the detention of a person without his consent and without lawful authority.'" *Martinez v. City of Avondale*, No. CV-12-1837-PHX-LOA, 2014 WL 178144, at *7 (D. Ariz. Jan. 16, 2014) (citing *Slade v. City of Phoenix*, 112 Ariz. 298, 300, 541 P.2d 550, 552 (1975)). "The essential element necessary to constitute either false arrest or false imprisonment is unlawful detention." *Slade*, 112 Ariz. at 300. "A detention which occurs pursuant to legal authority. . . is not an unlawful detention." *Id*. "To prove a false imprisonment claim, a plaintiff must allege and prove: (1) the defendant acted with intent to confine another person within boundaries fixed by the defendant; (2) the defendant's act resulted in such confinement, either directly or indirectly; and (3) the other person was conscious of the confinement or was harmed by it." *Martinez*, 2014 WL 178144, at *7.

Arizona Revised Statute § 13–1303(B) provides that, "in any prosecution for unlawful imprisonment, it is a defense that. . . the restraint was accomplished by a peace officer acting in good faith in the lawful performance of his duty." A.R.S § 13–1303(B)(1); *Martinez*, 2014 WL 178144, at *8. "Claims for false arrest brought under § 1983 to vindicate the Fourth Amendment right to be free from unreasonable seizures, are

1   'substantially the same' as claims for false arrest under state law." *Id.* (citing *Jocks v.*
2   *Tavernier*, 316 F.3d 128, 134 (2d Cir. 2003)).

3          On pendent state-law claims, federal district courts are bound by the decisions of
4   the Arizona Supreme Court. *Id.*; *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006)
5   (federal courts may exercise supplemental jurisdiction over state-law claims linked to a
6   claim based on federal law). Here, as in *Martinez*, the parties "have not provided, nor has
7   the Court's independent research discovered, any Arizona civil case that directly or
8   indirectly addresses the liability of an Arizona peace officer for false arrest in a similar
9   factual scenario." *Id.* "When a state's highest court has not squarely addressed an issue,
10  district courts must predict how the highest state court would decide the issue using
11  intermediate appellate court decisions, decisions from other jurisdictions, statutes,
12  treatises and restatements for guidance." *Id.* (citing *Glendale Assocs., Ltd. v. N.L.R.B.*,
13  347 F.3d 1145, 1154 (9th Cir. 2003)).

14         Viewing the evidence in the light most favorable to Plaintiffs, Defendant Green
15  arguably lacked the lawful authority or legal justification to arrest and detain Plaintiff
16  Cichon under the circumstances. Plaintif Cichon and Defendant Green have presented
17  conflicting factual accounts of the incident involving the door of the Tahoe police
18  vehicle, and the evidence before the Court does not conclusively resolve the dispute. This
19  genuine factual dispute, and whether the resolution of those facts supports Plaintiffs'
20  claim for false arrest and imprisonment, is for a jury to resolve. Therefore, summary
21  judgment is denied as to Count Four: False Arrest and Imprisonment.

22         **IX.   Qualified Immunity**

23         Defendants contend that they are entitled to qualified immunity. (Doc. 48 at 20.)
24  Citing *Saucier v. Katz*, 533 U.S. 194 (9th Cir. 2001), Defendants argue that "the totality
25  of the circumstances and attendant chaos should allow some deference to the officers
26  who were making split second decisions in a chaotic environment." (*Id.* at 22.)

27         Plaintiffs contend that Defendants are not entitled to qualified immunity on the
28  First Amendment claims because Defendants had "no plausible reason" to restrict the

protestors, considering that TPD had assisted protestors in marching on the public roadway during two previous marches that year. (Doc. 62 at 16.) Plaintiffs further contend that Defendants are not entitled to qualified immunity on the Fourth Amendment claims because Defendants exceeded the amount of force necessary under the circumstances and no reasonable officer could have concluded otherwise. (*Id*. at 17.) Plaintiffs contend that the law regarding a police officer's use of force against an individual who posed no threat to officers or the public was sufficiently clear at the time of the events at issue in this case that Defendants cannot claim qualified immunity on the ground that they made a reasonable mistake of law. (*Id*. at 17); *Saucier*, 533 U.S. at 205 (qualified immunity protects an officer's reasonable mistakes as to what the law requires).

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). On summary judgment, the Court determines the currently applicable law and whether the law was clearly established when the action occurred. *Id*. "If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Id*. "If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Id*. at 819.

The threshold consideration in determining whether qualified immunity shields an officer's actions is whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the officer's conduct violated a constitutional right. *Saucier*, 533 U.S. at 201; *see also Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (recognizing that *Saucier* protocol is "not mandatory" in all cases but remains beneficial). The next question is whether the constitutional right at issue was clearly established. *Id*.

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*. at 202. "[T]he right the official is alleged to have violated must have been clearly established" in a "particularized" sense. *Id*. "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id*. "The purpose of qualified immunity is to strike a balance between the competing need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Mattos*, 661 F.3d at 440 (citing *Pearson*, 555 U.S. at 231)).

### a.  First Amendment Claims

The Court finds that Defendants are not entitled to qualified immunity on the First Amendment claims. The Court has already found that a reasonable factfinder could conclude that Defendants violated Plaintiff's First Amendment rights. As discussed *supra*, the political speech in which the protestors were engaged is afforded the highest level of First Amendment protection. Furthermore, the protestors were exercising their rights to speech and assembly in a public forum, which further heightens the burden on the government to show that any restrictions on the exercise of that speech were lawful. The Defendants have not carried that burden at this stage.

Moreover, the protestors' constitutional right to engage in political speech and assembly was sufficiently established at the time of the events of this case that any reasonable officer would have understood that blocking or restricting that right without sufficient justification would violate the First Amendment. *See Mattos*, 661 F.3d at 442. This is not a new area of law. *Supra* at 21-24. Defendant Sergeant Baca's testimony reflects that TPD has historically prioritized facilitating and protecting citizens' First Amendment rights. (Doc. 46-1 at 68.)

Defendants advance a public safety justification for their actions in blocking the protest march down Congress Street. However, even if the protestors did violate the law

by entering the roadway and obstructing traffic, Defendants have not shown that their actions to restrict the Plaintiffs' First Amendment rights survive the "exacting scrutiny" to which restrictions on First Amendment rights to political speech and assembly are subject. *Schwarzenegger*, 591 F.3d at 1139. Nor have they shown that their purported goal of protecting public safety could not have been "achieved through means significantly less restrictive of associational freedoms." *Roberts*, 468 U.S. at 623. This law was clearly established at the time the events giving rise to this case occurred. *Supra* at 21-24. Therefore, a reasonable police officer should have known this law and complied with it. *Harlow*, 457 U.S. at 818.

### b. Fourth Amendment Claims

Bearing in mind the need to balance competing needs to hold public officials accountable when they exercise power irresponsibly and to shield officials from liability when they perform their duties reasonably, the Court finds that Defendants Green and Guevara are not entitled to qualified immunity on the Fourth Amendment claims.

The Court has already found that a reasonable factfinder could conclude that Defendants violated Plaintiffs' Fourth Amendment rights. The next step is to consider "whether the constitutional right was clearly established at the time of the conduct" such that any "reasonable official would have understood that what he is doing violates that right." *Mattos*, 661 F.3d at 442. "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id*. (citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). The "constitutional standard for excessive force— reasonableness—is always a very fact-specific inquiry." *Id*. It is settled law that the use of force must be proportional to the gravity of the threat. *Mattos*, 661 F.3d at 459 (citing *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (en banc); *Deorle v. Rutherford*, 272 F.3d 1272, 1279–80 (9th Cir.2001)); *see also Alicea v. Thomas*, 815 F.3d 283, 288 (7th Cir. 2016) (holding that force is only reasonable when it is proportional to the threat posed); *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1286 (10th Cir. 2007)

1   (use of Taser to control target was excessive where officer had "no reason to believe that

2   a lesser amount of force—or a verbal command—could not exact compliance").

3       The Court finds that the Fourth Amendment right to be free from excessive force

4   was clearly established such that it would have been clear to a reasonable officer that

5   Defendant Green and Guevara's use of force was unlawful in the situation they

6   confronted. This conclusion is bolstered by the findings of the TPD internal investigation

7   into Defendant Green's conduct at the protest, which found, among other things, that

8   Green's use of force was unjustified and constituted "severe misconduct," and that he

9   displayed "extremely poor judgment." (Doc. 63-1.) The TPD report found that Defendant

10  Green's actions demonstrated "an abuse of his authority as a police officer." (*Id*.) It

11  further found that he "over-reacted and used force out of proportion to the conduct of the

12  protestors he was dealing with" and that his use of force was "unwarranted." (*Id*.) These

13  evaluations are direct quotes from other police officers in the Tucson Police Department

14  and indicate that a reasonable officer would have understood that Defendant Green's

15  conduct violated the Fourth Amendment.[9]

16      Although no comparable internal evaluation exists for Defendant Guevara, the

17  Court is satisfied that a reasonable officer would have understood that Defendant

18  Guevara's use of pepper spray also violated the Fourth Amendment. The law was clearly

19  established at the time of the incident that an officer's use of force must be proportional

20  to the gravity of the threat. The facts and circumstances surrounding Defendant

21  Guevara's use of pepper spray indicate that his use of pepper spray could be viewed by a

22  reasonable factfinder as disproportionate to the threat or danger he faced and therefore as

23  unreasonable. Neither Defendant Green nor Defendant Guevara is entitled to qualified

24  immunity on the excessive force and battery claims.

25  . . . .

26  . . . .

27  _____
    [9] The TPD report did not analyze the incident involving Plaintiff Cichon and the door of
28  the Tahoe police vehicle. Viewing the disputed facts in the light most favorable to
    Plaintiff Cichon, Defendant Green's alleged use of force against Plaintiff Cichon was
    also unreasonable under the circumstances.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## X.    LUPE's Standing

Defendants contend that LUPE, the organization responsible for organizing the protest, is not a proper plaintiff in this case. (Doc. 48 at 19.) Defendants contend that LUPE—an organization comprised only of volunteers without any formal structure—is a non-jural entity without the ability to sue or bring a lawsuit. (*Id.*) However, Defendants cite no legal authority, other than the Black's Law Dictionary definition of "jural entity," to support this argument. Plaintiffs contend that LUPE's Complaint establishes standing under both organizational and associational theories, and that LUPE's organizational structure, or lack thereof, is not fatal to its standing. (Doc. 62 at 18-20.)

"The standing question is whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth v. Seldin*, 422 U.S. 490, 498–99 (1975). To establish standing, a plaintiff must allege three elements: (1) an "injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotations and citations omitted).

"The association must allege that its members, or any one of them, are suffering. . . injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." *Warth*, 422 U.S. at 511. "So long as this can be established, and so long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause, the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction." *Id.*; *see also Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 342 (1977) ("If the Commission were a voluntary membership

organization. . . its standing to bring this action as the representative of its constituents would be clear under prior decisions of this Court.")

Defendants have not provided, nor has the Court located, any authority prohibiting a volunteer-based political organization, such as LUPE, that lacks a Board of Directors, funding, or organizational structure, from bringing a lawsuit. Furthermore, LUPE has established the three elements necessary to confer standing.[10] LUPE alleges a concrete, particularized, and actual injury when it alleges that its members' First Amendment rights were violated by Defendants' conduct on February 16, 2017. The evidence shows that LUPE organized the February 16, 2017 protest as a political demonstration for immigrants' rights and that its members attended the protest for that purpose. That purpose was allegedly thwarted by Defendants' actions. Therefore, LUPE has also demonstrated a causal connection between the alleged injuries and the conduct it complains of. Finally, LUPE has shown that it is likely that the injuries suffered by its members, namely, the violations alleged in Count Two of the Complaint, would likely be redressed by a favorable decision, in that if a jury finds in its favor it could be awarded damages pursuant to 42 U.S.C. § 1983.

Accordingly,

**IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. 48) is **granted in part and denied in part**, as follows:

(1) Summary judgment is **granted** as to Count One;

(2) Summary judgment is **denied** as to Count Two;

(3) Summary judgment is **denied** as to Count Three;

(4) Summary judgment is **denied** as to the Count Four state law claims; and

. . . .

. . . .

. . . .

. . . .

---

[10] LUPE is a named Plaintiff only on Count Two, which alleges a claim under 42 U.S.C. § 1983 for First Amendment violations.

(5) Summary judgment is **denied** as to qualified immunity.

Dated this 30th day of June, 2020.

_____
Honorable Rosemary Márquez
United States District Judge